[No. 20348–7–I.   Division One.   March 13, 1989.]

*In the Matter of the Marriage of* ROBERT E. MORROW, *Appellant, and* BEVERLY J. MORROW, *Respondent.*

580

*Robert E. Morrow,* pro se, and *Malcolm Edwards* and *Edwards & Barbieri,* for appellant.

*Patricia C. Kaiser,* for respondent.

WEBSTER, J.—Robert E. Morrow appeals a decree of dissolution awarding his wife, Beverly J. Morrow, lifetime maintenance of $2,200 per month, requiring him to insure payment of his maintenance obligation, and ordering him to pay one–half, or $20,100, of Mrs. Morrow's attorney's fees and litigation expenses.

## FACTS

Robert and Beverly Morrow married in 1955. Both were in their early twenties, and neither owned any substantial

property. Mrs. Morrow helped support Mr. Morrow through college and professional school, where he earned a degree in accounting. She worked until her husband established a practice as a certified public accountant. Then she stayed home to raise three children born to the couple and to maintain the family household. Mr. Morrow's practice thrived, enabling the parties to live comfortably.

The parties separated in 1979. Mr. Morrow helped Mrs. Morrow obtain a college degree in accounting, enabling her to earn $750 a month as a part–time community college instructor. Full–time work has not been available to Mrs. Morrow, and has not been since she started working, in part because her vision has deteriorated. She suffers from diabetic retinopathy, an irreversible medical condition that occasionally renders her legally blind. Her illness requires her to rely on others for transportation and limits her ability to function independently at work.

Mr. Morrow moved in with another woman when the parties separated. The woman bequeathed him the bulk of her estate when she died, worth $375,000, representing two freight companies and a condominium that Mr. Morrow had previously acquired and given to her. Some time after Mr. Morrow received the bequest, he transferred legal ownership of the freight companies and condominium to third parties, but, in fact, he remained beneficial owner. Mr. Morrow also enjoyed the use and control of a sailboat valued at $80,000 and insured for $150,000, which he acquired during marriage, although a corporate shell held title to the boat.

Mrs. Morrow received $1,700 a month from Mr. Morrow, which his accounting practice paid as a fictitious salary to her for tax purposes and her social security benefits, until Mr. Morrow petitioned for dissolution on December 28, 1984. Thereafter, Mrs. Morrow received temporary maintenance of $2,500 per month, which the practice also paid. Mr. Morrow pursued a settlement with Mrs. Morrow, but

when she refused to accept his offer, he threatened to liquidate assets to her detriment and in fact liquidated retirement funds, resulting in a $70,000 tax loss.

On the first day of trial, Mr. and Mrs. Morrow submitted "affidavits for settlement conference and for trial" which listed their respective incomes, expenses, and property. The court and parties used the affidavits in lieu of testimony, and each side had an opportunity to cross–examine the other regarding the accuracy of the affidavits. Mr. Morrow's affidavit showed that his income exceeded $4,000 per month and that his expenses were $2,300 per month. Mrs. Morrow's affidavit disputed her husband's figures. She alleged that his income was approximately $200,000 annually and that his accounting practice already paid his personal expenses. She included a 1984 joint tax return listing the couple's gross income at $207,000 and taxable income at $175,000. Her affidavit showed her monthly income to be $750, reflecting her salary as a part–time teacher, and cataloged monthly expenses aggregating $3,266. She testified at trial that her affidavit accurately stated her expenses and that she needed the entire $2,500 per month that she received as temporary maintenance.

Following a 13–day trial devoted largely to untangling Mr. Morrow's financial affairs, the court awarded Mrs. Morrow one–half of the following community assets: the goodwill of Mr. Morrow's accounting practice ($150,000), the parties' marital residence ($66,000), and net proceeds from the sale of a condominium ($2,000). Mrs. Morrow's one–half share of these assets totaled $109,000. The court allowed Mrs. Morrow to keep an individual retirement account standing in her name worth $8,000 and required Mr. Morrow to pay off a $58,000 mortgage on a condominium in which Mrs. Morrow was residing.

Mr. Morrow retained his beneficial interest in the sailboat ($80,000 to $150,000), the two freight companies and the condominium received from his female companion's

estate ($375,000), personable receivables for unpaid commissions and fees ($220,000 to $300,000), and a note payable to him representing his "infusion" of community funds into one of his accounting practices ($125,000). Referring to the boat, two freight companies, and receivables, the court estimated in an unchallenged finding that Mr. Morrow possessed nearly $500,000 more in "resources identifiable to the parties."

The court awarded Mrs. Morrow lifetime maintenance of $2,200 per month, "terminating upon her death or remarriage", because "so many assets" were beyond the reach of distribution and because Mrs. Morrow's needs were "so great." The court ordered Mr. Morrow to obtain term life insurance as security for his maintenance obligation in an amount to be determined by a court appointed accountant subject to the court's approval. Additionally, the court ordered Mr. Morrow to pay one–half, or $20,100, of Mrs. Morrow's attorney fees and litigation expenses, a portion of which she incurred on this appeal.

PRETRIAL AFFIDAVIT

Mr. Morrow argues that the trial court should not have relied on Mrs. Morrow's pretrial affidavit to determine her monthly expenses. He cites *Blood v. Blood,* 69 Wn.2d 680, 419 P.2d 1006 (1966) in support of his argument.

Mr. Morrow's reliance on *Blood* is misplaced. In *Blood* the divorce court awarded virtually all of the property before it to one of the spouses based on that spouse's unsubstantiated pretrial affidavit. The affidavit listed the bulk of the property as the affiant's separate estate and placed a monetary value after each item. The Supreme Court reversed the award, holding that the *character* and *value* of the marital property should not have been gleaned from the affidavit because they were not substantiated by either spouse's testimony. *Blood,* at 681.

In contrast to *Blood,* Mrs. Morrow does not rely on her affidavit to rebut the presumption that property acquired during marriage is community in character. Nor is Mrs.

Morrow's listing of her personal expenses comparable to an appraisal of property. Mrs. Morrow testified that she prepared her affidavit entirely on her own and that it was an accurate statement of her expenses. Counsel for Mrs. Morrow did not elicit further testimony because opposing counsel had already admitted Mr. Morrow's affidavit "in lieu of testimony." Opposing counsel cross-examined Mrs. Morrow at length but only briefly touched on the expenses listed in her affidavit. When opposing counsel voiced his objection at the end of trial, the court gave him an opportunity to inquire further into the contents of Mrs. Morrow's affidavit before the court formally admitted it as an exhibit. Opposing counsel did not take advantage of this opportunity.

■ We conclude that Mrs. Morrow substantiated her affidavit by testimony, satisfying *Blood* to the extent that it applies to a statement of expenses. We also hold that Mr. Morrow invited the error he now asserts by acquiescing in Mrs. Morrow's use of her affidavit in lieu of testimony, after he used his affidavit in the same manner. Finally, Mr. Morrow waived his objection to the affidavit when he was given an opportunity at the end of trial to cross-examine Mrs. Morrow on the expenses she claimed in it.

### MAINTENANCE AWARD

Mr. Morrow's principal contention is that the trial court's maintenance award is excessive. He argues that Mrs. Morrow does not need $2,200 per month for life.

■ We might agree with Mr. Morrow if the division of property were "just and equitable" as contemplated by RCW 26.09.080. But the court could not make a "just and equitable" distribution of property under RCW 26.09.080, because Mr. Morrow transferred community assets to third parties not before the court. "Where the assets of the parties are insufficient to permit compensation to be effected entirely through property division, a supplemental award of maintenance is appropriate." *In re Marriage of Washburn*, 101 Wn.2d 168, 178, 677 P.2d 152 (1984).

■ RCW 26.09.090 permits awards of maintenance "in such amounts and for such periods of time as the court deems just". The court is to consider

all relevant factors including but not limited to:

(a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him, and his ability to meet his needs independently . . .;

(b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his skill, interests, style of life, and other attendant circumstances;

(c) The standard of living established during the marriage;

(d) The duration of the marriage;

(e) The age, physical and emotional condition, and financial obligations of the spouse seeking maintenance; and

(f) The ability of the spouse from whom maintenance is sought to meet his needs and financial obligations while meeting those of the spouse seeking maintenance.

RCW 26.09.090. "Under this provision, the only limitation placed upon the trial court's ability to award maintenance is that the amount and duration, considering all relevant factors, be just." *Washburn,* at 178.

A spouse's "demonstrated capacity of self–support does not automatically preclude an award of maintenance." *Washburn,* at 178. On the contrary,

the ability of the spouse seeking maintenance to meet his or her needs independently is only *one* factor to be considered. RCW 26.09.090(1)(a). The duration of the marriage and the standard of living established during the marriage must also be considered, making it clear that maintenance is not just a means of providing bare necessities, but rather a flexible tool by which the parties' standard of living may be equalized for an appropriate period of time. RCW 26.09.090(1)(c), (d).

*Washburn,* at 178–79.

In *Washburn,* the Supreme Court sanctioned the use of maintenance to compensate one spouse for contributions to

the other spouse's professional degree. Although Mrs. Morrow does not seek compensation for Mr. Morrow's professional degree, the reasoning of *Washburn* applies with equal or greater force here. Mrs. Morrow desires to share in community wealth that Mr. Morrow appropriated for his separate purposes. Mrs. Morrow lost more than a "mutual expectation of future financial benefit to the community," which justified a supplemental award of maintenance in *Washburn. See* 101 Wn.2d at 178. She lost vested property rights. The trial court did not have sufficient property before it to refund her community interest. Thus, the court used maintenance as a means of compensating Mrs. Morrow for what was rightfully hers.

The court properly considered the fact Mr. Morrow was in a "very advantageous position" at the expense of Mrs. Morrow due to his conversion of community property for separate purposes. "[T]he economic condition in which a dissolution decree leaves the parties is a paramount concern in determining issues of property division and maintenance." *Washburn,* at 181; *see also In re Marriage of Hadley,* 88 Wn.2d 649, 565 P.2d 790 (1977). In *Hadley,* the wife was awarded $545,000 in community property, representing considerably more than half of the community estate, and $480,000 in maintenance, payable in installments of $4,000 per month over a 10–year period. The Supreme Court upheld the maintenance award in part because the husband left the marriage with over $8 million in separate property, after entering the marriage with only $2.3 million, and because the wife had a progressively deteriorating physical condition, as does Mrs. Morrow. *See Hadley,* at 651–52. The disparity of wealth in *Hadley* did not result from a diversion of community funds to separate purposes, as it does in the Morrows' case. Thus, the justification for an award of maintenance to equalize the relative financial positions of divorcing spouses is greater here than it was in *Hadley.*

The trial court's maintenance award of $2,200 per month until Mrs. Morrow's death or remarriage properly reflects

the six factors listed in RCW 26.09.090. First, although Mrs. Morrow's actual need in excess of her income may be less than $2,200 per month, a spouse's need "is only *one* factor to be considered. RCW 26.09.090(1)(a)." *Washburn,* at 179. A much more important factor in this case is the fact that Mr. Morrow left the marriage with $500,000 more in resources identifiable to the parties. Interest alone on this amount would yield more than $2,200 a month for life. The $500,000 disparity represents an inequitable distribution of community property because the court found that Mr. Morrow was the source of "nearly all" of the property in his female companion's estate. All of the property before the court was presumptively community in character because it was acquired during marriage. We are bound by the community property presumption because the trial court did not characterize any property as Mr. Morrow's separate estate.

Second, Mrs. Morrow is not likely to achieve, by pursuing additional education and training, the financial independence enjoyed by Mr. Morrow. *See* RCW 26.09.090(1)(b). The trial court determined in an unchallenged finding that

> Mrs. Morrow has demonstrated exceptional fortitude and a remarkable persistence in spite of [her] serious medical problem. She has energetically utilized whatever resources have been made available to her. She has monitored her situation very carefully and has engaged in retraining . . . to maximize her abilities to the fullest.

Third, the parties enjoyed a high standard of living during their marriage. *See* RCW 26.09.090(1)(c). Their taxable income during the last year of their marriage was at least $175,000. Their actual income was probably much higher because Mr. Morrow was a skilled accountant who presumably knew how to shelter income from taxes.

Fourth, the parties were married 23 years before separating, during which time Mrs. Morrow sacrificed her earning potential by becoming a homemaker. *See* RCW 26.09-.090(1)(d). The court's award properly reflects the fact that Mrs. Morrow forfeited economic opportunities while her

husband capitalized on them. *Cf. Washburn,* at 181; *In re Marriage of Nicholson,* 17 Wn. App. 110, 116, 561 P.2d 116 (1977).

Fifth, Mrs. Morrow's physical disability warrants a higher award than would otherwise be appropriate. *See* RCW 26.09.090(1)(e); *see also Hadley.* Her disability makes lifetime maintenance reasonable under the circumstances. *See In re Marriage of Brossman,* 32 Wn. App. 851, 650 P.2d 246 (1982).

Sixth, Mr. Morrow is capable of paying the maintenance award without sacrificing his own needs. *See* RCW 26.09-.090(1)(f). Mr. Morrow's affidavit establishes that his net income was at least $4,000 per month at the time of trial. The parties' 1984 joint tax return proves that his monthly income was probably several times that amount. The court found that Mr. Morrow's accounting practice paid many of his personal expenses, including his $2,500 monthly maintenance obligation before trial. Finally, the court found that Mr. Morrow controlled the salary paid to him by his accounting practice, the fees paid to his practice by other entities which he controlled, and the payment decisions of his debtors. Mr. Morrow does not assign error to any of these findings.

A final factor that should be considered is Mr. Morrow's dissipation and probable concealment of assets. *See Nicholson,* 17 Wn. App. at 118–19; *Rentel v. Rentel,* 39 Wn.2d 729, 736, 238 P.2d 389 (1951). Mr. Morrow liquidated retirement funds resulting in a $70,000 tax loss, and the court found that he threatened to liquidate other assets "with the very real possibility of [his] being able to achieve certain results." The court also found that

> Mr. Morrow is an extremely adept accountant who has demonstrated great skill in the structuring and restructuring of various entities to maximum advantage while still managing to control the activities and benefits indirectly from numerous enterprises.

These findings are unchallenged.

We conclude based on the compensatory nature of the maintenance award, *see* *Washburn,* the parties relative financial positions, the six factors listed in RCW 26.09.090, and Mr. Morrow's concealment and dissipation of assets, that the award was not an abuse of discretion.

### INSURANCE OF MAINTENANCE OBLIGATION

Mr. Morrow next argues that the trial court abused its discretion by requiring him to insure his maintenance obligation without first finding that term insurance was available to him and that it was affordable.

In *Baker v. Baker,* 80 Wn.2d 736, 743, 498 P.2d 315 (1972), the Supreme Court upheld a dissolution decree requiring the husband to pay for his minor child's college education, although the decree did not specify the amount to be paid. The Supreme Court stated:

> The trial court could very well have had in mind that there was little basis on which to determine an exact amount for costs of a college education 7 years hence. . . . In the absence of a specific amount under these circumstances, those costs and expenses which are reasonably necessary to accomplish the purposes and direction of the decree would necessarily be implied.

*Baker,* at 743. In the case at hand, the trial court reasonably assumed that term insurance was available and that its cost would be minimal in comparison to the total award. Mr. Morrow was 52 years old and in good health at the time. The court ordered that the amount of coverage be determined by an accountant, subject to the court's approval. The record is silent as to whether an amount of coverage has yet been determined and approved. If the court appointed accountant has yet to calculate and the court to approve a particular amount of coverage, and it later turns out that Mr. Morrow is uninsurable or that premiums would be exorbitant, the court can limit its approval to an affordable amount of coverage. The court can waive the insurance requirement altogether if the court deems any amount of coverage too costly to justify the expense. On the other hand, if the court has already approved a

specified amount of coverage, the court still retains power to modify the order based on unforeseen circumstances. *See* RCW 26.09.170. Such circumstances would presumably include Mr. Morrow's possible uninsurability in the future or a substantial increase in the cost of insuring payment of his maintenance obligation. We thus conclude that Mr. Morrow's remedy, if any, is with the trial court.

## ATTORNEY FEES

Finally, Mr. Morrow argues that the trial court abused its discretion by requiring him to pay one–half, or $20,100, of Mrs. Morrow's attorney fees and litigation expenses.

■ Trial courts have authority to award attorney fees and expenses in marriage dissolution proceedings both at trial and on appeal. RCW 26.09.140; RAP 7.2(d). "An award of attorney's fees rests with the sound discretion of the trial court, which must balance the needs of the spouse requesting them with the ability of the other spouse to pay." *Kruger v. Kruger,* 37 Wn. App. 329, 333, 679 P.2d 961 (1984). A spouse's receipt of substantial property or maintenance does not preclude the spouse from also receiving an award of attorney fees and costs when the other spouse remains in a much better position to pay. *See Hadley; Suther v. Suther,* 28 Wn. App. 838, 627 P.2d 110 (1981). Awards have been found to be an abuse of discretion when the benefited spouse has received a majority of the parties' total assets, the same spouse is therefore in a better position to pay, and the other spouse already has an onerous financial burden. *See Nicholson; Cleaver v. Cleaver,* 10 Wn. App. 14, 21–22, 516 P.2d 508 (1973).

An important consideration apart from the relative abilities of the two spouses to pay is the extent to which one spouse's intransigence caused the spouse seeking the award to require additional legal services. *See In re Marriage of Harshman,* 18 Wn. App. 116, 128, 567 P.2d 667 (1977); *Eide v. Eide,* 1 Wn. App. 440, 445, 462 P.2d 562 (1969). When intransigence is established, the financial resources of the spouse seeking the award are irrelevant. *See Eide.*

Another factor to consider is the difficulty of the litigation, as measured by the number of days required to try the case and the size of the record. *See Friedlander v. Friedlander,* 58 Wn.2d 288, 290, 297, 362 P.2d 352 (1961) (5 days, 650 pages, and 127 exhibits). The necessity of having to unravel numerous transactions to establish community interests justifies an award reflecting the fees and costs incurred in the process. *See Friedlander; Fite v. Fite,* 3 Wn. App. 726, 736, 479 P.2d 560 (1970).

In view of these factors, we find no abuse of discretion in the $20,100 award. Mr. Morrow is in a much better position to pay Mrs. Morrow's attorney fees even after the court's award of property and maintenance to her. Moreover, an unchallenged finding states that Mrs. Morrow's fees and expenses were "necessitated in good measure by" Mr. Morrow's own intransigence. Thus, Mrs. Morrow's ability to pay is largely irrelevant. *See Eide.* Finally, 13 days of trial—encompassing 127 exhibits and over 1,000 pages of testimony—were required to unravel Mr. Morrow's financial affairs. The trial court's decision to require Mr. Morrow to pay only half of Mrs. Morrow's fees and costs was generous to him in these circumstances.

We affirm.

SWANSON, J., and PATRICK, J. Pro Tem., concur.