FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 APR -9 AM 8: 37

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 75498-0-I |
| ANGELIA MARIE PETERSON, | ) | (Consolidated with No. 76055-6-I) |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | UNPUBLISHED OPINION |
| | ) | |
| PAUL EDWIN PETERSON, | ) | |
| | ) | |
| Appellant. | ) | FILED: April 9, 2018 |

SCHINDLER, J. — Angelia Peterson suffers from multiple sclerosis and

optic neuritis. The court awarded Angelia[1] lifetime maintenance of $3,800 offset

by retirement pension, Social Security benefits, and amounts earned over $1,357

a month. Paul Peterson appeals the separation decree and the findings of fact

and conclusions of law on maintenance. For the first time on appeal, Paul

contends the court did not have the authority under CR 59 to reconsider an

untimely letter ruling and challenges the decision to award lifetime maintenance

to Angelia. Paul also appeals an order for attorney fees. CR 59(b) states a

motion for reconsideration "shall be filed not later than 10 days after the entry of

the judgment, order, or other decision." Because the letter ruling was not a final

---

[1] We use the first names of the parties for clarity.

decision terminating review, it is not an "other decision" subject to CR 59. The court did not err in granting the motion to reconsider the letter ruling before entry of the decree of separation and the findings of fact and conclusions of law. The record shows the court considered the factors under RCW 26.09.090 and did not err in awarding lifetime maintenance to Angelia or attorney fees to respond to the appeal. However, the record shows contrary to the court's express ruling, the final separation decree and the findings of fact and conclusions of law that Paul drafted state the award of maintenance is nonmodifiable as to duration and amount. We affirm but remand to strike the erroneous provision that states maintenance is nonmodifiable.

## FACTS

Paul and Angelia Peterson began dating in 1992 and started living together in 1996. The couple married on October 11, 1998. Paul worked as a firefighter for the Woodinville Fire Department. Angelia has an associate's degree. From 1992 until 1998, Angelia worked as a supervisor in customer service at Digital Systems International (DSI). After another company purchased DSI, Angelia worked as an independent contractor earning $5,000 a month. After the birth of their first child in 1999, Angelia stayed home to take care of the child.

In 2000, Angelia saw a specialist about severe pain in her left eye. The specialist diagnosed the condition as optic neuritis. Optic neuritis is an inflammation of the optic nerve that results in irretrievable vision loss.

Because optic neuritis is an early indicator of multiple sclerosis (MS), Angelia saw Seattle neurologist Dr. Steven Hamilton. Dr. Hamilton ordered an MRI.[2] The MRI showed three active lesions on Angelia's brain that indicated "progression of her MS lesions." Dr. Hamilton states MS is a "progressively deteriorating disease" that damages nerve cells in the brain and spinal cord.

In May 2001, Angelia gave birth to their second child.

In 2002, an MRI showed progression of the brain lesions. By 2008, Angelia was suffering from "excessive fatigue" and struggling to "think clearly or to concentrate." According to Dr. Hamilton, the "most common symptom" for MS patients "is fatigue which is difficult to treat." Angelia also suffered from "a marked degree of [bladder] frequency and urgency" caused by MS, resulting in the need to use the bathroom every 15 to 30 minutes.

In 2006, the family purchased a house and moved to Camano Island. In May or June 2009, Angelia started working from home for the Skagit Valley Youth Soccer Association earning $5,000 a month. The job ended in December because she could not attend the monthly night meetings. Although not legally blind, Angelia cannot drive "once it is dark out." Angelia said she had lost a "good portion" of her sight in the left eye from optic neuritis.

In 2012, Angelia went to local neurologist Dr. Patti Brettell. Dr. Brettell states Angelia had blurred and impaired vision, suffered from numbness and tingling, and had difficulty walking. According to Dr. Brettell, MS can cause the bladder to "become spastic and overactive" and the lesions on Angelia's spine

---

[2] Magnetic resonance imaging.

caused "severe issues with [her] bladder." A 2012 MRI showed lesions on the cervical and thoracic spine. In October, Dr. Brettell notes Angelia's left leg "has been problematic for her . . . suggesting MS exacerbation." Angelia also suffered from Lhermitte's phenomenon—a "shock like pain some MS patients experience" along the spine.

By early 2014, Angelia was experiencing chronic "urinary spasticity" and "chronic dizziness." In July, Dr. Brettell notes "significant weight loss," that Angelia "is much weaker," and that she "has had falls." Dr. Brettell also notes, "[G]ait unsteadiness as well as multiple bruises, consistent with a history of falls" related to MS.

In late April 2014, Angelia suffered a second episode of optic neuritis. In December, an MRI showed the size of the "inferior left frontal lobe lesion" had increased. Another brain scan in April 2015 showed more MS "plaque" and "progression of the left periventricular ring enhancing lesion, which suggests progression of [the] disease." Dr. Brettell states, "The patient's MS has progressed. . . . There has been progression by MRI. This suggests active MS even without enhancing lesions."

On April 15, 2014, Paul moved out of the family home on Camano Island. Angelia filed a petition for legal separation on August 11, 2014 in order to maintain medical insurance through Paul's employer. On October 6, the court entered a temporary order requiring Paul to pay Angelia $4,160 a month in maintenance and child support.

4

In January 2015, Angelia and the children moved out of the house on Camano Island. The bank foreclosed on the house.

Before trial, the parties agreed on the division of their assets and liabilities except the amount Angelia was entitled to receive from Paul's retirement pension. Paul and Angelia agreed to a parenting plan. The parenting plan allowed the two teenage children to spend equal amounts of time with each parent.[3]

The two-day trial began on February 18, 2016. The primary dispute at trial was the ability of Angelia to work and the amount and duration of maintenance. At the time of trial, Angelia was 51 years old and Paul was 45 years old and in good health. Angelia sought a lifetime award of maintenance of $4,000 a month. Paul agreed Angelia was entitled to maintenance for some period of time but argued she could work and support herself. Paul asked the court to order monthly maintenance of $3,800 through May 2016, reduce the amount to $3,000 through December 2017, and then terminate maintenance.

Angelia and Paul testified. The court admitted a number of exhibits into evidence, including the independent medical exam of Dr. Marc Bodow and the extensive medical records for Angelia.

Angelia testified her vision impairs her ability to read for more than 30 minutes and gives her "fierce headaches." She struggles with daily tasks due to debilitating fatigue and head and back pain. Angelia said she has medical

---

[3] Therefore, neither party sought a child support transfer payment.

insurance through Paul's employment. Without insurance, her medication costs would be more than $5,000 a month.

Angelia testified that from 1999 to 2009, she worked from home intermittently. Two in-home printing franchise businesses were "basically a break-even." Skagit Valley Youth Soccer Association terminated her employment in December 2009 because she could not drive to mandatory evening meetings.

Angelia has not been employed since 2009.[4] Angelia said she searches for jobs online but has difficulty finding positions that would accommodate her medical needs. Angelia said she recently found an in-home position but she was unable to attend the required six-month on-site training in Seattle.

Angelia applied for Social Security benefits in 2009 and 2014. Angelia testified the Social Security Administration (SSA) denied the applications because she did not pay Social Security as an independent contractor and "didn't have enough credit." Angelia said she recently applied for supplemental security disability income (SSI).

Paul has worked for the Woodinville Fire Department since October 1993. Paul received overtime pay every year since he joined the fire department except for 2015. Paul also receives "longevity pay." In 2014, Paul earned $120,000. In 2015, Paul earned approximately $110,000 because he did not work overtime. Paul said he wants to be a lieutenant by the time he retires and as a lieutenant,

---

[4] Angelia admitted that after she lost her job and her "MS started getting worse," she became depressed and was drinking a lot. Angelia testified she got help and by the time of trial, she had "been sober for two years."

his salary would increase by 15 percent. Paul said there is no mandatory retirement date for a firefighter and he can potentially "work forever" if he passes the physical requirements. Paul is eligible to retire from the fire department when he is 53 years old. Paul said he plans to pursue a "second career" after he retires.

Paul testified he regularly attended doctor appointments with Angelia and did not disagree with the symptoms she reported to the doctors. But because Angelia's previous jobs involved working with computers, Paul believed Angelia could continue to work from home after some additional training and education in bookkeeping or website design.

In his report, Dr. Bodow summarizes Angelia's medical history from 2008 to 2015 and describes his interview and physical examination of Angelia. Dr. Bodow states Angelia is unsteady on her feet, walks awkwardly, and has diffuse weakness to the left lower extremity. Dr. Bodow states the nature of MS is "periodic worsening and remissions in an unpredictable manner" and may "worsen over prolonged time." But he states, "I do not feel that [Angelia] is totally disabled." Dr. Bodow believed that "what makes the most sense is that [Angelia] could work a position out of her home, as she has done in the past," so she would not have to drive and to allow "ad lib access to the restroom."

On April 27, 2016, the court issued a three-page letter ruling. The letter addressed the amount and duration of maintenance.

> Both parties agree that the wife has the need for spousal maintenance and the husband has the financial ability to pay spousal maintenance. The central issue, however, is the amount and duration of the spousal maintenance.

7

Based on the pay stubs Paul submitted for December 2015, the court found his "disposable pay is over $7,500 per month. His reasonable household expenses are approximately $2,824 per month." The letter states:

> The wife suffers from the complications of multiple sclerosis. She is incontinent, nearly blind in one eye, and has an uneven gait which results in falls. She is not able to be further than 15 minutes from a bathroom, any upset in her routine causes her stress, and her night visit [sic] is poor, which curtails her driving after dark. When she has flare-ups, she has debilitating migraines and pain. She suffers from depression, fatigue and dizziness. She has applied for Social Security Disability and been denied. She will be eligible for social security benefits of $700 per month when she is 62 years old, 11 years from now.

The court found Angelia's reasonable expenses are $4,100 per month. The court found that "in 2009, even though she was suffering from multiple sclerosis, [Angelia] worked full to part time from her home, earning $5,000 per month." The court found Angelia is "capable of working part time from home" and imputed income of $1,357 a month to her.

> In the past, she has worked from home in customer service for Ed[die] Bauer and has done in-home printing for a couple of franchises. Because of her disabilities, the court finds that she would, on a more probable than not basis, be capable of working part time from home and imputes income to her of $1,357 per month. If she was able to find a job similar to ones she had before, which accommodate her disability, her income would be significantly more. However, she testified that she has attempted to find such jobs and has not met with success.

The letter ruling states Paul shall pay Angelia $3,500 a month in spousal maintenance for five years offset by any amount Angelia receives in Social Security disability benefits or amounts earned over her imputed income. The court awarded Angelia 55 percent of Paul's pension, which she is eligible to

receive when Paul turns 53. The letter states the "maintenance shall go down by the amount of the retirement available to her."

At the conclusion of the letter, the court states, "The court will enter an order to this effect upon proper presentation of the same."

On May 24, Angelia filed a motion for reconsideration and clarification of the letter ruling. Angelia cited CR 59 and argued reconsideration on a number of grounds, including the division of child tax exemptions and expenses, the exclusion of medical insurance and costs, maintenance, and her ability to work. Angelia asked the court to reconsider finding that she was capable of working part time at home and the amount and duration of maintenance. In support, Angelia submitted a declaration and a May 5, 2016 letter from SSA stating, "You have been found medically approved" for SSI. Angelia addressed her ability to work in the declaration.

5. The finding that I am able to work. After trial and the court's written decision, I received a decision from the Social Security Administration that I am medically disabled. I cannot work.

6. The termination of maintenance in five years and the total amount of support. My condition will not improve. In five years I will be left with minimal (and possibly no) income. I ask that I receive support for the remainder of my life, with deductions for any other income I may receive, and that the total amount be $4,100.00 as I cannot work or supplement my income.

7. When I am required to take Mr. Peterson's retirement. If I receive 55% of Mr. Peterson's retirement when he actually retires, I should have sufficient funds to live. If not, I ask that I continue to receive maintenance for my life. I ask my income and maintenance be reviewed at the time of his retirement.

. . . .

. . . Multiple Sclerosis is a degenerative disease for which there is no cure. There is no medical help that will cure me. There is no prognosis that I will improve. I will only get worse. I have

markedly declined in the past several years and have to face my uncertain future. I cannot work. My only income will come from the support and assets awarded to me by the court.

Angelia addressed her concern about losing medical coverage if Paul converted the legal separation decree to a decree of dissolution.

I am absolutely required to have medical insurance due to my medical condition of Multiple Sclerosis. I have medications which cost thousands of dollars each month that I cannot afford without medical insurance. I have estimated my expenses to be at least $500.00 per month for medical insurance, but what will be covered is questionable. I don't know what I am going to do when the coverage stops.

The court held a hearing on the motion to reconsider on June 10. Paul conceded $4,100 a month in expenses for Angelia was reasonable. But Paul argued that because the evidence showed Angelia was capable of working, the court should not award lifetime maintenance. Paul requested the court deny reconsideration because the court already considered Angelia's disability in determining the amount and duration of maintenance.

The court ruled on the motion for reconsideration at the conclusion of the hearing. After reviewing the evidence, including the report of Paul's expert Dr. Bodow, and considering the factors under RCW 26.09.090 and "the circumstances that each party will be in after the dissolution is over," the court found Angelia's "possibilities of finding a job and being able to continue in that job are less than what I thought."

So I believe that she did have the ability to earn some money. However, I don't think that I took in consideration — Although I should have — the progressive nature of MS.
It is not a disease from which you recover. It's a disease from which you suffer. And that you continuously become worse.

10

It's — it's not an upward spiral; it's a downward spiral. So I don't think that I considered that even if she's available or could potentially earn some money now, what would her disability — Which is not contested, and medically is not contested that it is a disability — it's a debilitating illness, what that will do with her potential in the future.

. . . I need to look at the circumstances that each party will be in after the dissolution is over.

And the circumstances for Ms. Peterson are not bright. Her future is not bright at all.

The court clarified Angelia was entitled to receive 55 percent of the marital portion of Paul's pension. The court ruled Angelia is entitled to lifetime maintenance of $3,800 a month offset by the amount of Paul's retirement she receives, Social Security benefits, and any income over the amount previously imputed. The court ruled that if Paul decided to convert the separation decree to a dissolution decree, maintenance "shall increase to compensate [Angelia] for the increase in her medical insurance" but "no more than $500 per month." The court ruled maintenance would be modifiable "as to the term and as to the amount."

On June 28, 2016, the court entered the decree of legal separation and findings of fact and conclusions of law. The legal separation decree and the findings of fact and conclusions of law state, in pertinent part:

SPOUSAL MAINTENANCE.

Spousal maintenance shall be paid as follows and shall be non-modifiable as to the term and as to the amount:

Beginning July 1, 2016, the Respondent/Husband shall pay the Petitioner/Wife $3,800.00 per month in maintenance for the wife's lifetime.

The Petitioner/Wife shall be awarded 55% of the marital portion of the husband's retirement account. Her spousal maintenance shall

11

go down by the amount of the retirement she elects to take. Further, if the wife qualifies for any social security disability or social security benefit, her spousal maintenance will go down by such amount. Likewise, if the wife's net monthly earning power increases over the amount imputed to her, her spousal maintenance shall decrease by that net amount.

On July 11, 2016, Paul filed an appeal of the June 28, 2016 decree of separation and the findings of fact and conclusions of law. On October 24, 2016, the court granted Angelia's request for an award of attorney fees to respond to the appeal. On November 4, Paul filed an appeal of the award of attorney fees. We consolidated the appeals.

## ANALYSIS

### Timeliness of Motion for Reconsideration of Letter Ruling

For the first time on appeal, Paul contends the court did not have the authority to reconsider the letter decision under CR 59(b). Paul also contends the motion was not supported by newly discovered evidence.

CR 59(a) provides:

**Grounds for New Trial or Reconsideration.** On the motion of the party aggrieved, a verdict may be vacated and a new trial granted to all or any of the parties, and on all issues, or on some of the issues when such issues are clearly and fairly separable and distinct, or any other decision or order may be vacated and reconsideration granted. Such motion may be granted for any one of the following causes materially affecting the substantial rights of such parties:

(1) Irregularity in the proceedings of the court, jury or adverse party, or any order of the court, or abuse of discretion, by which such party was prevented from having a fair trial.

(2) Misconduct of prevailing party or jury; and whenever any one or more of the jurors shall have been induced to assent to any general or special verdict or to a finding on any question or questions submitted to the jury by the court, other and different from the juror's own conclusions, and arrived at by a resort to the

determination of chance or lot, such misconduct may be proved by the affidavits of one or more of the jurors;

(3)  Accident or surprise which ordinary prudence could not have guarded against;

(4)  Newly discovered evidence, material for the party making the application, which the party could not with reasonable diligence have discovered and produced at the trial;

(5)  Damages so excessive or inadequate as unmistakably to indicate that the verdict must have been the result of passion or prejudice;

(6)  Error in the assessment of the amount of recovery whether too large or too small, when the action is upon a contract, or for the injury or detention of property;

(7)  That there is no evidence or reasonable inference from the evidence to justify the verdict or the decision, or that it is contrary to law;

(8)  Error in law occurring at the trial and objected to at the time by the party making the application; or

(9)  That substantial justice has not been done.

Former CR 59(b) (2004), "Time for Motion; Contents of Motion," stated a party shall file a motion for reconsideration "not later than 10 days after the entry of the judgment."[5]  In 2005, the Supreme Court amended CR 59(b).  Adoptions & Amendments of Rules of Court, 54 Wn.2d 1101, 1121 (2005).  As amended, CR 59(b) states a party shall file a motion for reconsideration "not later than 10 days

---

[5] Former CR 59(b) stated:

**Time for Motion; Contents of Motion.**  A motion for a new trial or for reconsideration shall be served and filed not later than 10 days after the entry of the judgment.  The motion shall be noted at the time it is filed, to be heard or otherwise considered within 30 days after the entry of the judgment unless the court directs otherwise.

A motion for a new trial or for reconsideration shall identify the specific reasons in fact and law as to each ground on which the motion is based.

(Emphasis added) (boldface in original).

after the entry of the judgment, order, or other decision."[6]

CR 54(a) defines a "judgment" and an "order." A "judgment" is "the final determination of the rights of the parties in the action and includes any decree and order from which an appeal lies. A judgment shall be in writing and signed by the judge and filed forthwith as provided in [CR] 58."[7] CR 54(a)(1). CR 54(a)(2) states, "Every direction of a court or judge, made or entered in writing, not included in a judgment, is denominated an order." Under CR 54(e), "the prevailing party shall prepare and present a proposed form of order or judgment not later than 15 days after the entry of the verdict or decision, or at any other time as the court may direct." CR 54(f)(2) requires five days' notice of presentation of the proposed order or judgment.

The Court Rules do not define "other decision." Paul contends that because the ruling was in writing, the letter decision is an "other decision" under CR 59(b) and the court did not have the authority to consider the untimely motion for reconsideration. A trial court may not extend the time period for filing a motion for reconsideration under CR 59(b). CR 6(b); Schaefco, Inc. v. Columbia

---

[6] CR 59(b) states:

**Time for Motion; Contents of Motion.** A motion for a new trial or for reconsideration shall be filed not later than 10 days after the entry of the judgment, order, or other decision. The motion shall be noted at the time it is filed, to be heard or otherwise considered within 30 days after the entry of the judgment, order, or other decision, unless the court directs otherwise.

A motion for a new trial or for reconsideration shall identify the specific reasons in fact and law as to each ground on which the motion is based.

(Emphasis added) (boldface in original). In In re Marriage of Tahat, 182 Wn. App. 655, 668, 334 P.3d 1131 (2014), the court notes the amendment also strikes the word "served." Former CR 59(b). Former CR 59(b) required both filing and service of the motion within 10 days. Tahat, 182 Wn. App. at 668 (citing 15 KARL B. TEGLAND, WASHINGTON PRACTICE: CIVIL PROCEDURE § 38:20 (2d ed. & Supp. 2013)).

[7] CR 58(a) states, "[A]ll judgments shall be entered immediately after they are signed by the judge."

14

River Gorge Comm'n, 121 Wn.2d 366, 367-68, 849 P.2d 1225 (1993).[8] Angelia contends that because the letter ruling was not a final decision, the motion for reconsideration is not subject to CR 59.

In In re Marriage of Tahat, 182 Wn. App. 655, 334 P.3d 1131 (2014), the court addressed whether a letter ruling issued before entry of the decree and findings of fact and conclusions of law is an "other decision" subject to CR 59. In Tahat, the court sent a three-page letter ruling to the parties. Tahat, 182 Wn. App. at 660-61. Twenty-seven days later, Hassan Tahat filed a motion for reconsideration. Tahat, 182 Wn. App. at 667. Mary Rose Tahat argued the court did not have the authority under CR 59(b) to rule on the untimely motion. Tahat, 182 Wn. App. at 667.

After considering the 2005 amendment to CR 59(b), the Court Rules, and the doctrines of ejusdem generis[9] and noscitur a sociis,[10] the court in Tahat concluded an "other decision" is "similar in nature to judgments and orders." Tahat, 182 Wn. App. at 671-72. "Judgments and orders are types of 'decisions.' Therefore, we limit the meaning of 'decision' under CR 59(b) to court actions similar in nature to judgments and orders." Tahat, 182 Wn. App. at 671-72. The

---

[8] On appeal, Paul argues the letter ruling is an order because the court could enforce it "to the point of contempt." But at oral argument, Paul's attorney conceded the letter ruling is not an order.

[9] Under the cannon of ejusdem generis, where general words follow specific words in a statutory enumeration of particular classes of things, the general words are construed to " 'embrace only objects similar in nature to those objects enumerated by the preceding specific words.' " Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 114-15, 121 S. Ct. 1302, 149 L. Ed. 2d 234 (2001) (quoting 2A N. SINGER, SUTHERLAND ON STATUTES & STATUTORY CONSTRUCTION § 47.17 (1991)).

[10] Under the maxim of noscitur a sociis, the meaning of words may be indicated or controlled by associated words. Tahat, 182 Wn. App. at 671.

court held:

> [I]in a superior court bench trial, a litigant has 10 days from the date of the entry of formal findings of fact, conclusions of law, and a judgment, a decree, or another final order labeled as such, to file a motion for reconsideration. A letter ruling does not commence the 10 days.

Tahat, 182 Wn. App. at 674-75.

The court also notes, "Washington case law has long considered letter rulings as preliminary or tentative decisions subject to change before a final decision" and not subject to the 10-day time limit to file a motion for reconsideration under CR 59(b). Tahat, 182 Wn. App. at 672; see also Earl v. Geftax, 43 Wn.2d 529, 530, 262 P.2d 183 (1953) ("The trial court can freely change its mind until a formal judgment is entered."); Alwood v. Harper, 94 Wn. App. 396, 400-01, 973 P.2d 12 (1999) (Prior to entry of a final judgment or decree, the trial court can "correct any mistakes.").

Likewise, a memorandum opinion has "no greater force than an oral opinion." Hawley v. Priest Rapids Ice & Cold Storage Co., 172 Wash. 71, 72-73, 19 P.2d 400 (1933). A memorandum opinion is "an expression of the then opinion of the court and should be considered only as a direction to counsel in preparation of a final order." Chandler v. Doran Co., 44 Wn.2d 396, 400, 267 P.2d 907 (1954); McClelland v. McClelland, 170 Wash. 170, 174, 15 P.2d 941 (1932) (Until findings of fact, conclusions of law, and the final order "were signed, the disposition of the cause was subject to the conscience of the court."). "An expressed intention to perform a future act is not the same as performing the act itself. Until final judgment is entered, the trial judge is not bound by a prior

16

expressed intention to rule in a certain manner." DGHI Enters. v. Pac. Cities, Inc., 137 Wn.2d 933, 944, 977 P.2d 1231 (1999).[11]

In Chaffee v. Keller Rohrback LLP, 200 Wn. App. 66, 401 P.3d 418 (2017), we addressed whether a motion for reconsideration was untimely and supported by newly discovered evidence under CR 59. We cited the Supreme Court decision in In re Detention of Williams, 147 Wn.2d 476, 491-92, 55 P.3d 597 (2002),[12] that "CR 59(b) explicitly applies to a motion for reconsideration filed after the entry of judgment" to conclude the motion for reconsideration was not subject to CR 59. Chaffee, 200 Wn. App. at 74-75.

> The Supreme Court's conclusion [in Williams] is evidenced by both the juxtaposition of CR 59 within the Superior Court Civil Rules and by the context of the rule itself. CR 59 is included in chapter 7 of the Superior Court Civil Rules, entitled "Judgment" (Rules 54-63). The other rules within chapter 7 include CR 54, dealing with judgments and costs; CR 55, dealing with default judgments; CR 56, dealing with summary judgments; CR 57, dealing with declaratory judgments; CR 58, dealing with the entry of judgments; CR 60, dealing with relief from a judgment or order; and CR 62, dealing with a stay of proceedings to enforce a judgment. The surrounding Civil Rules thus address judgments and final orders. All of these rules deal either with the entry of final judgments or posttrial matters.

Chaffee, 200 Wn. App. at 75.

Like judgments and orders, we concluded an "other decision" must be a determination subject to appeal. Chaffee, 200 Wn. App. at 75. In the "context of

---

[11] At oral argument, Paul acknowledged that if the court had read the letter into the record, the ruling would be an oral decision, not a final "other decision." Paul argues the letter decision the court filed is a final decision. An oral decision is "no more than a verbal expression of [the court's] informal opinion at the time. It is necessarily subject to further study and consideration, and may be altered, modified, or completely abandoned." Ferree v. Doric Co., 62 Wn.2d 561, 566-67, 383 P.2d 900 (1963); see also Greico v. Wilson, 144 Wn. App. 865, 872, 184 P.3d 668 (2008); DGHI, 137 Wn.2d at 944; Hubbard v. Scroggin, 68 Wn. App. 883, 887, 846 P.2d 580 (1993); In re Marriage of Barrett, 33 Wn. App. 420, 422, 655 P.2d 257 (1982).

[12] Emphasis in original.

the rule and the surrounding language," we concluded CR 59 requires finality. Chaffee, 200 Wn. App. at 75-76; see also Wlasiuk v. Whirlpool Corp., 76 Wn. App. 250, 253, 884 P.2d 13 (1994) ("The policy served by requiring finality before appeal is to conserve appellate energy and eliminate delays caused by interlocutory appeals."). Because the motion for reconsideration was not a "final order terminating the dispute," the requirements of CR 59 did not apply. Chaffee, 200 Wn. App. at 76.[13]

Here, the unequivocal language of the letter makes clear the letter ruling is not final. The court directs the parties to take additional steps before entry of the separation decree and the findings of fact and conclusions of law. The letter states, "The court will enter an order to this effect upon proper presentation of the same."[14] We adhere to the decision in Tahat and Chaffee and hold the letter ruling was not an "other decision" subject to the requirements of a CR 59 and the court had the authority to reconsider before entering the final separation decree and findings of fact and conclusions of law.[15]

---

[13] Contrary to Chaffee and without citation to authority, Washington Practice states the 2005 amendment to CR 59 "expressly authorize[d]" motions for reconsideration of interlocutory orders. 15 TEGLAND, WASHINGTON PRACTICE: CIVIL PROCEDURE § 38:6. Washington Practice states, "CR 59(a) makes it clear that counsel may file a motion for reconsideration of any decision or order, interlocutory or final." 4 KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE, at 526 (6th ed. 2013) (emphasis added).

[14] Following receipt of the letter decision, the parties did not prepare or present a final separation decree or findings of fact and conclusions of law. We also note the trial court earlier issued another letter ruling on October 12, 2015 that used the same language. The letter ruling addressed Paul's motion to reduce maintenance from $4,160 to $2,500 a month pending trial and at the conclusion of the letter, the court states, "The court will enter the orders when presented." The court entered the order four weeks later on November 9.

[15] Therefore, we need not address the argument that the motion to reconsider was not supported by newly discovered evidence under CR 59(a)(4).

Even if the motion to reconsider was not subject to the requirements of CR 59, Paul asserts substantial evidence did not support the decision. Paul argues that as in In re Marriage of Coyle, 61 Wn. App. 653, 656-59, 811 P.2d 244 (1991), the decision to reconsider without finding a substantial change in circumstances is error. Coyle is inapposite. Coyle addressed whether the husband met his burden of proving a substantial change in circumstances to justify modification of the dissolution decree and termination of the award of maintenance under RCW 26.09.170.

Lifetime Maintenance

In the alternative, Paul contends the trial court erred by awarding lifetime maintenance to Angelia.

The court has broad discretion to award maintenance. In re Marriage of Bulicek, 59 Wn. App. 630, 633, 800 P.2d 394 (1990). Absent a showing of manifest abuse of discretion, we will not disturb the award of maintenance. In re Marriage of Washburn, 101 Wn.2d 168, 179, 677 P.2d 152 (1984). The only limitation on the amount and duration of maintenance under RCW 26.09.090 is that the award must be just. In re Marriage of Wright, 179 Wn. App. 257, 269, 319 P.3d 45 (2013); Washburn, 101 Wn.2d at 182.

RCW 26.09.090(1) states the court must consider the following factors:

(a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently . . . ;

(b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;

19

(c) The standard of living established during the marriage or domestic partnership;

(d) The duration of the marriage or domestic partnership;

(e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and

(f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

While the trial court must consider the listed factors, it is not required to make specific factual findings on all of the factors. In re Marriage of Mansour, 126 Wn. App. 1, 16, 106 P.3d 768 (2004). Ultimately, the court's main concern must be the parties' economic situations postdissolution. Washburn, 101 Wn.2d at 181.

Although permanent maintenance is disfavored, "a lifetime maintenance award in a reasonable amount is proper 'when it is clear the party seeking maintenance will not be able to contribute significantly to . . . her own livelihood.' " In re Marriage of Valente, 179 Wn. App. 817, 822, 320 P.3d 115 (2014)[16] (quoting In re Marriage of Mathews, 70 Wn. App. 116, 124, 853 P.2d 462 (1993)); In re Marriage of Morrow, 53 Wn. App. 579, 588, 770 P.2d 197 (1989).

Paul argues that as in Mathews, the court did not engage in "a fair consideration of the statutory factors." Mathews, 70 Wn. App. at 123. We disagree. In Mathews, although the husband had no significant personal property and the wife received the equity from the sale of the family home and had income from a part-time job, the court ordered the husband to pay nearly

---

[16] Alteration in original.

two-thirds of his monthly salary in maintenance to the wife for an indefinite amount of time. Mathews, 70 Wn. App. at 123-24. Because the record showed the husband did not have the ability to meet his needs while meeting the obligations imposed by the trial court and the trial court overlooked the effect of an indefinite maintenance obligation and retirement income, we remanded the maintenance award for reconsideration. Mathews, 70 Wn. App. at 124-25.

Here, unlike in Mathews, the record shows the court considered the RCW 26.09.090 factors, including age, medical condition, current and expected income, and the retirement pension. Citing Dr. Bodow's report, the court found the nature of MS is "periodic worsening and remissions in an unpredictable pattern." Although Dr. Bodow believed Angelia was not "totally disabled" and could work from home, the court noted such employment depends on "her finding a job that will allow her to work from home," and "there are few places of employment that could accommodate Ms. Peterson's disability."

The court considered Angelia's financial resources and the ability to meet her needs independently. The court ruled, "It's been six years since [Angelia] had that job." On reconsideration, the court found her "possibilities of finding a job and being able to continue in that job are less than what I thought. It is simply the nature of the illness." The court considered Angelia's estimated monthly expenses, including housing, food, and personal expenses, and concluded her reasonable monthly expenses are $4,160. If Paul converts the decree of legal separation to a decree of dissolution, the court concluded spousal

21

maintenance should increase to compensate Angelia for the increase in medical insurance, but "no more than $500 per month."

The court addressed Paul's ability to meet his own needs and financial obligations and considered "whether or not I am putting more spousal maintenance on him than it will leave him to live on." The court found Paul's current monthly net income is approximately $7,500, that his income will continue to increase, and that his monthly household expenses are $2,824. The court concluded $3,800 "would be appropriate" in monthly spousal maintenance but ordered the $3,800 shall be offset by the amount Angelia receives from Paul's retirement account, SSA or SSI benefits, and any amount she earns over her previously imputed income of $1,357 a month.

Paul argues no case law supports an award of lifetime maintenance for a mid-term marriage. We disagree. In In re Marriage of Tower, 55 Wn. App. 697, 698-99, 780 P.2d 863 (1989), the couple was married 19 years and the trial court awarded permanent maintenance to the wife who suffered the "progressively debilitating" disease of MS.

Paul argues absent an expert opinion, the court erred in concluding MS is "a debilitating illness that progresses and becomes worse over time." The undisputed record, including Dr. Bodow's independent medical examination and report and the medical records, supports the court's finding.

The court did not abuse its discretion in awarding Angelia lifetime maintenance of $3,800 per month offset by pension, Social Security benefits, and any income she earns over $1,357 a month.

Nonmodifiable Maintenance

Paul asserts the trial court erred as a matter of law in ordering the maintenance nonmodifiable. Angelia agrees the language that states maintenance is nonmodifiable is erroneous and must be stricken.

Paul claims that under In re Marriage of Short, 125 Wn.2d 865, 890 P.2d 12 (1995), we should remand to reconsider the amount and duration of the maintenance award. Angelia argues Paul invited the error and we should remand only to strike the erroneous provision.

Absent an express agreement by the parties, a court may not make an award of maintenance nonmodifiable. Short, 125 Wn.2d at 876. In Short, the Supreme Court held, "[W]henever a nonmodifiable maintenance award provision is stricken from a decree of dissolution, the amount and duration of the maintenance award must be reconsidered." Short, 125 Wn.2d at 876.

Here, the record establishes the court ruled unequivocally, "I'm not going to make this non-modifiable as to the term and as to the amount." Paul drafted the proposed decree of separation and the findings of fact and conclusions of law. The decree erroneously states that maintenance is nonmodifiable. The court signed the proposed separation decree and findings of fact and conclusions of law that contained the nonmodifiable language. Paul cannot set up an error below and then challenge it on appeal. In re Marriage of Morris, 176 Wn. App. 893, 900, 309 P.3d 767 (2013); Angelo Prop. Co., LP v. Hafiz, 167 Wn. App. 789, 823, 274 P.3d 1075 (2012). Unlike in Short, because the undisputed record

shows the court did not intend to make the maintenance nonmodifiable, we remand only to correct the error.

Attorney Fees Award

Paul argues the trial court erred in awarding Angelia $5,000 in attorney fees to respond to the appeal. Under RAP 7.2(d), the trial court has the authority to award attorney fees in legal separation proceedings on appeal. See also Morrow, 53 Wn. App. at 590. In awarding fees, the court must balance the needs of the spouse requesting fees with the ability of the other spouse to pay. Morrow, 53 Wn. App. at 590. "A spouse's receipt of substantial property or maintenance does not preclude the spouse from also receiving an award of attorney fees and costs when the other spouse remains in a much better position to pay." Morrow, 53 Wn. App. at 590.

The court held a hearing and considered the declarations and financial statements of the parties. The court found, "[T]he need versus ability is certainly on the wife's — or the ex-wife's side." The court awarded Angelia $5,000 to respond to the appeal. The trial court had the authority to award attorney fees under RAP 7.2(d). The court did not abuse its discretion by awarding Angelia $5,000 to respond to the appeal.[17]

Paul objects to Angelia's request for fees on appeal under RAP 18.1 and RCW 26.09.140. RAP 18.1(a) entitles a party to reasonable fees and costs if an applicable law grants that right. RCW 26.09.140 states, "Upon any appeal, the

---

[17] Under GR 14.1, a party may cite to an unpublished opinion as persuasive authority. The case Paul cites, In re Marriage of Aldridge, No. 31597-5-III (Wash. App. Ct. Oct. 16, 2014) (unpublished), http://www.courts.wa.gov/opinions/pdf/315975.unp.pdf, does not address RAP 7.2.

appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs." In determining whether to award fees, we examine the arguable merits of the issues on appeal and the financial resources of the respective parties. In re Marriage of Griffin, 114 Wn.2d 772, 779-80, 791 P.2d 519 (1990).

The financial declarations show Angelia receives $3,800 in taxable spousal maintenance per month. Paul states his monthly gross income is $10,460. We award Angelia attorney fees on appeal offset by the previous $5,000 award.

We remand to strike the nonmodifiable language in the maintenance provision of the decree of legal separation and the findings of fact and conclusions of law. In all other respects, we affirm.

WE CONCUR:

25