IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 37753-9-III |
| | ) | |
| RACHEL M. MIDDLETON, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | UNPUBLISHED OPINION |
| and | ) | |
| | ) | |
| ROBERT W. MIDDLETON, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Robert W. Middleton appeals the trial court's property and attorney fee award in this marital invalidity action. We affirm and deny both parties' requests for attorney fees on appeal.

## FACTS

In 2013, Rachel M. Middleton believed she got married to Robert W. Middleton. In 2018, she learned that Robert[1] was still married to his previous spouse. On March 29, 2019, after a domestic violence incident, Rachel filed this petition for invalidity.

---

[1] We refer to parties by their first names to avoid overuse of "Mr." and "Mrs."

*Protection orders*

On April 8, 2019, Rachel moved for a temporary protection order against Robert in which she also asked the court to divide their debts and property. A hearing was scheduled for May 3. On May 1, Robert filed a lengthy declaration objecting to the division of property "as part of temporary orders." Clerk's Papers (CP) at 27. He argued these issues would be better addressed at trial.

The next month, Rachel filed a "Petition for Order for Protection," alleging Robert had violated the temporary order on several occasions. CP at 36-42. Robert filed a lengthy response with numerous exhibits disputing her allegations.

On July 17, after a contested hearing, the court granted Rachel's protection order. The court also awarded her attorney fees to be determined based on her counsel's fee statement. This statement was not filed until after the trial in this matter.

*Invalidation proceedings*

Robert did not respond to Rachel's March 2019 petition for invalidity. On October 11, 2019, Rachel filed a "Motion for Default." CP at 234-35. On October 30, 2019, after a hearing on the default motion, Robert responded pro se. He filed another pro se response on June 19, 2020. Neither response was offered or admitted at trial.

The parties proceeded to trial on June 22, 2020. Robert moved to change venue, arguing Judge Gary Libey had not been fair to him and he wanted "a judge who is not impartial and not shown bias against [him]." Report of Proceedings (RP) at 119. Judge Libey said he did not recall meeting Robert before that morning in the hallway. An argument ensued, ultimately ending in the court denying any motion to change venue or continue the trial.

Rachel and Robert each testified. Rachel offered 15 exhibits,[2] including mortgage statements, car payments, and credit card bills. Robert represented himself and did not call witnesses or offer exhibits. Throughout trial, Robert continually interrupted Rachel and her attorney and ignored the court's orders to be quiet. The parties discussed the following relevant assets and liabilities:

*Malden property*

Rachel testified that the parties' community home in Malden was purchased in January 2016 for $75,000.00 with a down payment of between $9,000.00 and $10,000.00. When the parties separated, they still owed $64,439.62 on the mortgage. Rachel argued the home was a community asset with a gross value of $75,000.00 and a net value of $10,561.00, and it should be awarded to her.

---

[2] These exhibits are not part of the appellate record.

Robert testified that he paid a $15,000 down payment on the Malden property using his separate funds. The funds came from time loss payments resulting from a workplace accident that happened before the marriage. He did not have any paperwork showing deposits of those payments because he did not have a bank account at the time. He explained: "I used a $15,000 [cashier's] check to the payment that came back and asked me to sign a paperwork that I was going to give it as a gift and I did it in protest because I knew we needed a house and I wish I wouldn't have." RP at 216.

Robert pointed out that the parties were unable to get an appraisal on the community home because they could not participate in mediation given Rachel's protection order against him. He testified that the Malden property was worth between $120,000 and $150,000 according to an online appraisal.

*Retirement funds*

Rachel requested that the entirety of her retirement fund, which she started in 2003, be awarded to her. The court asked to confirm its value because "it is a potential community asset" but "she's got it listed as zero." RP at 201. Rachel stated the value was less than $5,000 because she withdrew $17,000 in 2017 to pay for her mother's funeral and $6,000 to pay for two of the parties' vehicles. Robert stated (during his cross-

examination of Rachel) that he wanted one-half of Rachel's retirement funds from the time they were married.

Rachel testified that she was unaware of any retirement funds in Robert's name. On cross-examination, Robert confirmed: "Now, you don't know nothing about my retirement or anything, correct?" RP at 189. Rachel said she did not. Rachel's attorney sent out discovery requests to Robert regarding his retirement funds, if any, but received no response.

### *Other assets and liabilities*

Rachel provided a spreadsheet of assets and debts for distribution.[3] Robert did not provide his own proposed assets and debts worksheet, but he disagreed with Rachel's distributions and valuations.

Rachel requested three vehicles and testified to their value: (1) a 2014 Ford Fusion with a net negative value of $4,799, (2) a 2017 Ford Flex with a net negative value of $6,499, and (3) a Willys Jeep worth $4,500. Rachel requested the court award her the parties' car hauler/trailer worth $4,000, an antique Ford tractor, and a utility trailer worth $1,500.

---

[3] Unfortunately, Rachel's assets and debts spreadsheet is not in the record, although it is frequently referenced during testimony and was ultimately adopted by the trial court.

Rachel requested the court award two vehicles to Robert. First, the parties previously owned a 2002 Subaru Outback, which was worth $3,000. Robert had possession of that vehicle and Rachel believed he sold it. Robert testified that he had traded the Subaru to pay his $500 rent and that he still owed more money. Second, the parties purchased a 1996 34-foot Dolphin motorhome during the marriage that was worth $15,000. Robert had possession of the motorhome and did not object to its value or distribution.

Rachel requested household appliances worth about $3,000 and electronics worth $500 be awarded to her. Robert appeared to dispute her valuation, arguing that the stove, washer, and dryer were worth "no less than $1,000" and the refrigerator, "[l]ooking online," was worth $2,000—all of which he paid for with his debit card.[4] RP at 210. Rachel requested an antique Murphy bed worth $200 and a Sleep Number bed worth $4,200. Robert disputed the Sleep Number bed valuation, arguing it was worth $5,000 and was also purchased with his debit card.

---

[4] The values Robert assigns to the appliances add up to $3,000. He may be referencing other goods not discussed at trial such as furniture, the receipts of which he attached to his response to Rachel's invalidation petition.

Finally, Rachel asked that she be awarded two of their dogs who were not breeding

females and who had no monetary value.  Robert would be awarded the other two dogs

who could still be bred.

Rachel testified to the parties' debts: they had a PayPal credit card with an

unknown balance, a J.C. Penney's credit card with a $480.68 balance, a Merrick Bank

credit card with a $2,200.00 balance, a Chase Bank credit card with a $492.86 balance,

and a First Interstate Bank credit card with a $300.00 limit and an unknown balance.

Rachel agreed to take on the credit card debts, regardless of whether they were

community or separate.  She also agreed to take on the Dish Network bill and the parties'

Les Schwab bill for services to their vehicles during the marriage.

Rachel requested that Robert be awarded his own medical bills, noting that some

were in her name because he was on her insurance, as well as an outstanding Frontier

Internet bill that was in Robert's name.

*Financial standing*

At the time of trial, Rachel earned around $53,000 yearly working as an insurance

agent.

Robert testified that he had been receiving time loss payments from June 2010 to

November 2019 due to a workplace injury.  He received a $34,372.44 payment in

November 2015 for the period between April 2014-2015. At the time of trial, Robert had no monthly income and was living with a friend. He did not provide financial records or a financial declaration to the court.

The parties had a joint savings account, but did not have a joint checking account. Rachel frequently gave Robert cash for items they purchased.

*Trial court's ruling*

After hearing both parties' testimony, the court found that Robert was married to another person when he married Rachel and he "admitted under oath that he thinks he's still married to [the other person]." RP at 221. The court treated the matter as a petition to invalidate the marriage, which requires consideration of the same factors as dissolution. Regarding the parties' credibility, the court found:

> The Court has considered the testimony of [Rachel] and finds that her testimony is credible, well-documented, and researched and to the point. On the other hand, [Robert's] testimony is erratic, unreliable, not credible, and has been totally a challenge for the Court to consider because of it's [sic] lack of direction and lack of focus.

RP at 221.

The court continued:

> [Rachel]'s spreadsheet[5] is reasonable and fair and is adopted by the Court as the distribution to the parties. The . . . Court will not award the equalizing payment of $1,994. However, the—all the other documentation, all the other assets as listed will be distributed per the Exhibit.

RP at 221.

Rachel requested attorney fees, which had been reserved in the original protection order, in the amount of $8,000. During trial, she testified that the amount of attorney fees is directly attributable to Robert's behavior because he "[says] things that make no sense and he refuses to communicate in a civil manner." RP at 137. Robert protested the fee award, arguing that he has no income and is on disability, and said, "You are a bunch of hypocrites." RP at 224. The court asked for Rachel's attorney to itemize the fees before ruling: "[Robert]'s conduct has made the matter more litigious than necessary and the Court will award fees." RP at 224. Robert commented, "this is kangaroo court Whitman County" and stated that he is friends with Donald Trump, Jr. before being directed to leave the courtroom. RP at 224. The court ultimately awarded Rachel $6,961 in attorney fees and costs.

Robert did not attend the presentment hearing. On August 19, 2020, the trial court entered an invalid marriage order and findings and conclusions about a marriage. The court adopted Rachel's proposed assets and liabilities division. Rachel was awarded the

---

[5] This spreadsheet is not part of the record on appeal.

Malden property, the Ford Fusion, the Ford Flex, the Willys Jeep, the Ford tractor, the utility trailer, the Sleep Number and Murphy beds, all household appliances and electronics, and two of the parties' four dogs. Rachel was also awarded her retirement account. She was assigned all debts associated with the property awarded, as well as all debts in her name including medical bills, five credit card bills, a Dish Network bill, and a Les Schwab bill.

Robert was awarded the motorhome, the Subaru Outback, two antique China cabinets, a 1965 boat and trailer, and two of the parties' four dogs. He was assigned all debts in his name including medical bills, the trash bill, and the Frontier Internet bill.

Robert timely appealed.

ANALYSIS

MALDEN PROPERTY

Robert contends the trial court erred in awarding Rachel the Malden property without awarding him an equitable lien to reflect a down payment he claims to have made with separate funds. We disagree.

At a marriage invalidation trial, the court makes a just and equitable distribution of the parties' assets and liabilities based on factors enumerated in RCW 26.09.080.[6] *In re Marriage of Larson*, 178 Wn. App. 133, 137, 313 P.3d 1228 (2013). We review the distribution and valuation of property for abuse of discretion. *In re Marriage of Brewer*, 137 Wn.2d 756, 769, 976 P.2d 102 (1999). A court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds. *In re Marriage of Chandola*, 180 Wn.2d 632, 642, 327 P.3d 644 (2014).

Separate property is that which was owned prior to marriage or acquired afterward by gift, bequest, devise, descent, or inheritance. RCW 26.16.010. Community property is all nonseparate property acquired during the marriage by either spouse. RCW 26.16.030. We presume all property acquired during marriage is community property, but a party may rebut this presumption with clear and convincing evidence that the property was acquired with separate funds. *In re Marriage of Chumbley*, 150 Wn.2d 1, 5-6, 74 P.3d 129 (2003); *In re Marriage of Skarbek*, 100 Wn. App. 444, 449, 997 P.2d 447 (2000).

---

[6] The rules governing property distribution in invalidation petitions are the same as those for dissolution proceedings. RCW 26.09.040(3).

Robert argues that under the "mortgage rule," he maintains an interest in the Malden property because he contributed separate property toward its purchase. The mortgage rule provides that when one party makes a cash payment toward real property at acquisition, that party retains a fractional share of the ownership proportionate to that payment no matter how the remaining obligation on the property is paid. *Chumbley*, 150 Wn.2d at 7-8 (quoting Harry M. Cross, *The Community Property Law in Washington* (Revised 1985), 61 WASH. L. REV. 13, 40 (1986)).

The trial court did not make any finding on whether Robert made a cash payment from his separate funds when the parties acquired the Malden property. Instead, the trial court found Rachel credible and Robert not credible.

Rachel testified that the *parties* paid a down payment of approximately $9,000 toward the Malden property. Robert offered no evidence aside from his own testimony that he used $15,000 of separate funds for the down payment. Based on the trial court's credibility determination, we presume the down payment was paid by the parties, not separately by Robert. For this reason, the mortgage rule does not apply.

RACHEL'S RETIREMENT ACCOUNT

Robert contends the trial court erred in awarding Rachel her entire retirement account when community contributions were made during the marriage. We disagree.

12

As discussed above, trial courts have considerable discretion in distributing and categorizing property during marriage invalidation proceedings, and we do not reverse those decisions absent an abuse of discretion. *Brewer*, 137 Wn.2d at 769; *In re Marriage of Doneen*, 197 Wn. App. 941, 949, 391 P.3d 594 (2017).

Although the record contains minimal information regarding Rachel's retirement account, we conclude that the trial court did not abuse its discretion in awarding it to her. Rachel testified that it had around $5,000 in it when the parties married and around $5,000 at the time of their dissolution because multiple family emergencies caused her to withdraw funds. Those withdrawals were community expenses because they occurred during marriage, and Robert brought no evidence to the contrary. Thus, although it did not explicitly rule on the issue, we can discern from the record that the trial court found Rachel's retirement account had no community value and only separate value. Robert was therefore not entitled to a portion of Rachel's retirement fund.

JUST AND EQUITABLE DISTRIBUTION

Robert contends the trial court erred by failing to make a just, fair, and equitable property division. We disagree.

A trial court's distribution of property need not be equal, but it must be fair, just, and equitable. *In re Marriage of Hadley*, 88 Wn.2d 649, 656, 565 P.2d 790 (1977).

"Fairness is attained by considering all circumstances of the marriage and by exercising discretion, not by utilizing inflexible rules." *In re Marriage of Tower*, 55 Wn. App. 697, 700, 780 P.2d 863 (1989). The trial court has considerable discretion in determining what is just and equitable. *Doneen*, 197 Wn. App. at 949. Because the trial court is in the best position to determine what is fair in each case, we reverse only if there has been a manifest abuse of discretion. *Id.*; *Brewer*, 137 Wn.2d at 769; *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005). Again, a trial court abuses its discretion when its decision is made on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Robert's argument seems to rest on the fact that the trial court failed to enter findings on the values of the property before it. While we agree that the court should have entered findings on the values of the assets and liabilities, we know that the court adopted Rachel's proposed spreadsheet.

A party presenting an issue for review has the burden of providing an adequate record to establish such error. *State v. Sisouvanh*, 175 Wn.2d 607, 619, 290 P.3d 942 (2012). In this appeal, Robert has not provided Rachel's proposed distribution and spreadsheet. Regardless, an appellate court may affirm so long as the incomplete record

14

sufficiently supports the decision. *Id.* As discussed below, the record is adequate for us to affirm.

In its oral decision, the court stated it declined to award an equalizing payment of $1,994. From this, we infer that the property award was roughly equal. Because the evidence shows the property award was roughly equal, we reject Robert's argument that the property award was not just, fair, and equitable. We discern no abuse of discretion.

ATTORNEY FEES

Robert contends the trial court erred in awarding attorney fees to Rachel. He argues she has not demonstrated need, he does not have the financial resources to pay, and he was not intransigent. Both parties seek fees on appeal. We address the issues in turn.

*Attorney fees at trial*

After considering the financial resources of both parties, a court may order a party to pay the reasonable attorney fees of the other party for maintaining or defending a dissolution action. RCW 26.09.140. Another basis for awarding attorney fees is intransigence. *In re Marriage of Wixom*, 190 Wn. App. 719, 725, 360 P.3d 960 (2015). Intransigence may be shown by "litigious behavior, bringing excessive motions, or discovery abuses." *In re Marriage of Wallace*, 111 Wn. App. 697, 710, 45 P.3d 1131

(2002).  Washington courts have also found parties intransigent when they are "motivated by their desire to delay proceedings or to run up costs."  *In re Kelly*, 170 Wn. App. 722, 740, 287 P.3d 12 (2012); *see also In re Marriage of Foley*, 84 Wn. App. 839, 846, 930 P.2d 929 (1997) (finding intransigence when husband caused delays by filing frivolous motions, refusing to appear for deposition, and refusing to read correspondence from wife's attorney).  When intransigence has been established, the ability of one spouse to pay is no longer relevant.  *In re Marriage of Morrow*, 53 Wn. App. 579, 590, 770 P.2d 197 (1989).

The trial court found that Rachel incurred fees and costs and needed help paying them, and Robert had the ability to help pay.  Although the court did not use the word "intransigent," it found Robert "made this matter more litigious than it needed to be which caused [Rachel] to incur additional attorney fees."  CP at 357.

The trial court awarded Rachel total attorney fees and costs of $6,961.  Some of these fees and costs were undoubtedly related to her successful petition for a protection order.  To that extent, the court's oral finding that Rachel incurred fees and costs and needs help paying is supported by the record.  In addition, the trial court awarded Robert $4,000 more in net property.  This greater net property award supports the trial court's

16

finding that Robert had the ability to pay.  Largely because of these two considerations, we discern no abuse of discretion in the trial court's attorney fee award.

### *Attorney fees on appeal*

Both parties request fees on appeal.  For the reasons set forth below, we decline to grant an award of attorney fees to either party.

#### *Rachel's fee request*

Rachel's request for fees appears at the end of a section of her brief devoted to why this court should reject Robert's fee request.  It states: "[Rachel] also respectfully requests an award of attorney fees and costs under RCW 26.50.060(g) and RAP 18.1(d) if she is successful."  *See* Resp't's Br. at 13.

RAP 18.1(b) provides: "The party must devote a section of its opening brief to the request for the fees or expenses."  This procedure is mandatory.  *Pruitt v. Douglas County*, 116 Wn. App. 547, 560, 66 P.3d 1111 (2003).  Furthermore, parties must make arguments and cite to authority to support a fee request.  *Austin v. U.S. Bank of Wash.*, 73 Wn. App. 293, 313, 869 P.2d 404 (1994).  RAP 18.1(b) "requires more than a bald request for attorney fees on appeal."  *Phillips Bldg. Co. v. An*, 81 Wn. App. 696, 705, 915 P.2d 1146 (1996).

17

Even if we were to overlook the fact that Rachel did not devote a separate section to this request, the two authorities she cites do not support her request.

RCW 26.50.060(1)(g) provides that a court may, upon notice and after hearing, require the respondent in a domestic violence proceeding to pay costs and reasonable attorney fees. That statute does not mention fees on appeal. Although Robert had notice and a hearing on fees awarded at the trial level, the domestic violence statute does not support a fee award on appeal of a marriage invalidation petition. Nor did Rachel provide argument as to why it should.

RAP 18.1(d) provides that a party will file an affidavit detailing expenses incurred and services performed by counsel within 10 days of a decision awarding that party the right to reasonable attorney fees and expenses. But Rachel has not cited a statute or court rule that would entitle her to fees on appeal in the first place.

For these reasons, we deny her fee request.

### *Robert's fee request*

Robert requests fees pursuant to RCW 26.09.140 and RAP 18.1. Under RCW 26.09.140, appellate courts have the discretion to grant attorney fees. In doing so, we consider the parties' relative ability to pay and the merit of the issues on appeal. *Muhammad*, 153 Wn.2d at 807.

No. 37753-9-III
*Marriage of Middleton*

The issues raised by Robert on appeal have little merit. We exercise our discretion and deny his request for attorney fees.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____        _____
Siddoway, A.C.J.                                          Staab, J.

19