[No. 28349. Department One. April 14, 1942.]

*In the Matter of the Estate of* CLARENCE O. DEWEY, *Deceased.*

LILY E. DEWEY, *as Administratrix, Respondent,* v. RAY H. DEWEY, *Appellant.*[1]

[1] Reported in 124 P. (2d) 805.

*William A. Johnson,* for appellant.

*Newton & Newton,* for respondent.

DRIVER, J.—Clarence O. Dewey died intestate in 1939, leaving as heirs his widow, a brother, a half brother, two sisters, and the two children of a deceased sister. The widow was appointed administratrix, and, in the course of the probate proceedings, a controversy developed as to whether a certain tract of land, the only real property of the estate in King county, formerly the site of a road house known as The Plantation, was separate or community property. After a hearing on the merits, the trial court, in its

decree of distribution, found and adjudged the tract to be community property. The decedent's brother has appealed.

It is appellant's contention that part of the purchase price of the King county tract was paid from the separate funds of the decedent, and, therefore, to that extent, was separate property. According to the evidence, the tract was acquired by the decedent in three separate parcels. One was purchased December 6, 1927, for $3,032.60; another was purchased on the same date for $300.53; and the third was acquired by purchasing and foreclosing an outstanding mortgage thereon. The assignment of this mortgage to decedent was dated November 2, 1927, and the amount paid therefor was $7,746.90. None of the mortgage foreclosure proceedings are in evidence; hence, the cost of the foreclosure is not shown, nor is the date of either the certificate of purchase or the sheriff's deed. It seems to have been assumed by all concerned in the instant litigation that the time of the acquisition of the parcel in question was the date of the assignment of the mortgage. Of necessity, we must adopt that assumption also.

In August, 1929, Mr. and Mrs. Dewey executed a mortgage to one P. S. Sapp on this parcel. It appears to be respondent's contention that this mortgage was a renewal of an earlier one which was outstanding at the time of decedent's acquisition of the property, and, therefore, should be regarded as constituting a part of the purchase price. However, there is no competent evidence in the record of any such earlier mortgage, and the sum paid, as stated above, for the assignment of the mortgage that was foreclosed must be taken as the entire consideration paid for the third parcel; thus, so far as the record discloses, the outlay for all of the real property in controversy was $11,080.03.

Mr. Dewey and respondent were married October 7, 1925. He owned practically all the capital stock of the Pastime Amusement Parlors, Inc., which operated a pool hall in Everett. In addition to the usual pool and billiard tables, it had card rooms, a lunch counter, candy counter, and barber shop. He was the president and manager of the company, and, from September, 1922, until January, 1930, his salary was six hundred dollars a month. That was established beyond question by the testimony of respondent, by Mr. Dewey's individual income tax returns, and by the books and records of the Pastime corporation.

The marital community had no source of income other than the husband's salary. It was not paid regularly in monthly or other periodic amounts. For her household expenses, respondent received twenty-five dollars a week. But, otherwise, Mr. Dewey apparently drew on the funds of the corporation largely in accordance with his needs. In some months, he drew only a small part of his salary of six hundred dollars, while, in others, he was paid several times that amount.

On November 2, 1927, the date of the assignment to him of the mortgage on the King county real property, Mr. Dewey received a check from the Pastime corporation in the amount of $4,500, and, on December 6th, when the rest of the property was deeded to him, he received another check of the corporation for $3,250. The money obtained on the two checks, aggregating $7,750, the trial court found, and both appellant and respondent now agree, went into the purchase of that property. Appellant contends that the money was the separate property of the decedent. He concedes that the remainder of the consideration for the King county property was paid with community funds.

From what source, then, did the $7,750 come—was it a part of Mr. Dewey's salary earned after marriage,

or was it taken from the capital, the surplus, or the earnings of the Pastime corporation? Upon the answer to that question depends the determination of the entire controversy.

The corporation was scrupulously treated as a distinct entity, and its business was kept separate and apart from that of the community. Its income tax returns indicate that it kept a double entry system of books. It had its own separate bank account, and there was no commingling of its funds and property with those of the community. It would not, therefore, be difficult to solve our problem if we had all the books and records of the corporation; but, unfortunately, we do not have them. There is in evidence an account book, described by one of the witnesses as a combination cash book and journal. The ledger could not be found. We also have the corporate minute book, some canceled bank checks, check and deposit registers, and income tax returns of the corporation and of the decedent.

The journal shows that each month Mr. Dewey's account was credited with his salary of six hundred dollars. A payment made to him may be identified by the notation "COD" or "CODewey" on the journal entry (the bank check number also appears), but, with one exception, whether or not the payment was to apply on salary is not definitely indicated. One entry, made in December, 1926, in the amount of $2,500, is plainly marked as a dividend payment. The minutes of a meeting of the stockholders show that the dividend was duly declared, and the journal leaves no room for doubt that it was paid to Mr. Dewey in the stated amount. Aside from that one instance, while the journal entries, supplemented by other available records, establish the amounts withdrawn from the corporation by the decedent from the date of his marriage until the

purchase of the real property in controversy, they do not definitely show what such withdrawals were for. And there is no book or record in evidence which specifically gives us the condition of Mr. Dewey's salary account at any particular time.

A balance sheet of the Pastime corporation, as of December 31, 1925 (a little over three months after the marriage), taken from its income tax return, shows assets amounting to $25,069.06, of which sum almost fifteen thousand dollars was in cash. Liabilities in the same amount as the assets included capital stock, twenty thousand dollars, and undivided profits, $360.60. The net income for the calendar year 1926 was $1,762.43.

The corporation's income tax return for the year 1927 shows a net loss of $1,120.15. From the marriage, October 7, 1925, until the purchase of the King county property was completed on December 6, 1927, Mr. Dewey's salary—26 months at six hundred dollars a month—amounted to $15,600. During that time, he drew from the corporation (other than the $2,500 dividend hereinabove mentioned) a total of $22,236.13, including respondent's weekly household allowance and the $7,750 now in dispute. It can readily be seen that, at the time of the purchase, Mr. Dewey had drawn $6,636.13 more than his salary allowance. Manifestly, the excess was not salary earned after marriage, but consisted, rather, of separate funds withdrawn by Mr. Dewey from his Pastime corporation.

In reference to our adoption of the date of Mr. Dewey's marriage as the starting point of the computation of his salary account, it should be noted that, so far as the record discloses, the corporation did not owe him any back salary on that date. The journal, which is the only account book of the corporation in evidence, begins with November 1, 1924. From then

until the marriage, he received from the corporation an average of more than six hundred dollars a month.

Property acquired by purchase after marriage is presumed to be community property, and the burden rests upon the one asserting its separate character to establish his claim by clear and satisfactory evidence. *Ballard v. Slyfield,* 47 Wash. 174, 91 Pac. 642; *Denny v. Schwabacher,* 54 Wash. 689, 104 Pac. 137, 132 Am. St. 1140; *In re Slocum's Estate,* 83 Wash. 158, 145 Pac. 204; *Seaton v. Smith,* 186 Wash. 447, 58 P. (2d) 830. The status of property, either real or personal, is to be determined as of the date of its acquisition. *Heintz v. Brown,* 46 Wash. 387, 90 Pac. 211, 123 Am. St. 937; *Katterhagen v. Meister,* 75 Wash. 112, 134 Pac. 673; *In re Binge's Estate,* 5 Wn. (2d) 446, 105 P. (2d) 689; *Conley v. Moe,* 7 Wn. (2d) 355, 110 P. (2d) 172, 133 A. L. R. 1089.

Separate property continues to be separate through all of its changes and transitions as long as it can be clearly traced and identified, and its rents, issues, and profits remain separate property. *In re Brown's Estate,* 124 Wash. 273, 214 Pac. 10; *Rogers v. Joughin,* 152 Wash. 448, 277 Pac. 988; *State ex rel. Van Moss v. Sailors,* 180 Wash. 269, 39 P. (2d) 397; *In re Binge's Estate, supra.*

The following excerpt from *Guye v. Guye,* 63 Wash. 340, 352, 115 Pac. 731, 37 L. R. A. (N. S.) 186, quoted with approval in *State ex rel. Van Moss v. Sailors, supra,* and in the later case of *In re Finch's Estate,* 198 Wash. 567, 89 P. (2d) 218, we think, is applicable here also:

"Moreover, the right of the spouses in their separate property is as sacred as is the right in their community property, and when it is once made to appear that property was once of a separate character, it will be presumed that it maintains that character *until some*

*direct and positive evidence to the contrary is made to appear."* (Italics ours.)

Applying the rules just stated to the circumstances of the instant case, it seems too clear to require further comment that all of the property and funds of the Pastime corporation, together with the rents, issues, and profits thereof after marriage, were the separate property of Mr. Dewey; that his salary after marriage belonged to the community; and that the funds in excess of his salary allowance, which he withdrew from the corporation for the purchase of the King county land in the fall of 1927, must be presumed to have maintained their separate character in the absence of some direct and positive evidence to the contrary.

As we have stated, the total sum paid for the King county property was $11,080.03. Of that amount, $6,636.13 was paid from Mr. Dewey's separate funds. It follows that an undivided fractional part of this real property, in the ratio 6,636.13:11,080.03, was the separate property of Clarence O. Dewey, the remainder being community property. *Zintheo v. Goodrich Rubber Co.,* 136 Wash. 196, 239 Pac. 391; *In re Gulstine's Estate,* 166 Wash. 325, 6 P. (2d) 628.

In computing the amount of salary Mr. Dewey drew from the Pastime corporation, we have included items which ultimately went to another corporation. These items were paid by the corporation's checks—one for one thousand dollars, dated November 24, 1926, to Edna C. Dewey, and seven others in varying amounts, aggregating $3,900, payable to the order of "The Plantation, Inc.," with dates ranging from February 10 to November 1, 1927. The trial court concluded, and respondent now maintains, that these items should be regarded as loans made by the Pastime corporation to

the Plantation corporation. The record does not support the conclusion.

The Plantation corporation, when the payments in question were made, was operating a roadhouse on the real property in King county with which we are here concerned, although it never acquired title thereto. Decedent's sister Edna C. Dewey was its manager. Eventually, it became insolvent and went into bankruptcy. Respondent testified that, after their marriage, she and Mr. Dewey became "interested in The Plantation, Inc.," and that all of the checks payable to that corporation and the check of one thousand dollars to Edna C. Dewey, represented money which they had "put into" it. Respondent also testified that the Pastime Amusement Parlors had no interest in the Plantation corporation. This testimony is supported by the cash book-journal of the Pastime corporation. It shows that all of the withdrawals in question were charged to Mr. Dewey's account. There is nothing whatsoever in any of the available books and records of the Pastime corporation to indicate that it had ever made any loan or advance to the Plantation.

Finally, respondent contends that, even though we should find that the $7,750 in controversy did not all come from Mr. Dewey's salary, we should, nevertheless, consider it as a loan from the Pastime corporation to the community for the purchase of the King county property.

There is no evidence of any such loan on the books of the corporation or elsewhere in the record. No note or other evidence of indebtedness was given to the corporation either by the community or by Mr. Dewey. Respondent, in her testimony, did not claim that the community had borrowed any money from her husband's corporation. A loan cannot be presumed in the absence of some positive evidence. As we have already

pointed out, separate property is presumed to remain separate until the contrary is made to appear.

We have not overlooked respondent's testimony to the effect that the entire purchase price of the King county real property came from Mr. Dewey's salary. She admitted on cross-examination that she had not participated in the management of the Pastime corporation, and that she did not keep, or assist in the keeping of, its books. She merely stated a conclusion which could not have been based upon her direct, personal knowledge. Her conclusion cannot prevail against the documentary proof.

The cause is remanded, with direction to the superior court to modify its decree of distribution in accordance with the views expressed in this opinion.

ROBINSON, C. J., MAIN, STEINERT, and BLAKE, JJ., concur.