[No. 72539-0.   En Banc.]

Argued February 25, 2003.     Decided August 14, 2003.

*In the Matter of the Marriage of* GERALD STEVEN CHUMBLEY, *Respondent,* and MARY PATRICIA BECKMANN, *Petitioner.*

2

*Charles K. Wiggins* and *Kenneth W. Masters* (of *Wiggins & Masters, P.L.L.C.*), for petitioner.

*Catherine Wright Smith* (of *Edwards, Sieh, Smith & Goodfriend, P.S.*), for respondent.

MADSEN, J. — During her marriage to Gerald Chumbley, Mary Patricia Beckmann acquired stock options through her employment. Beckmann exercised the options on three occasions, once by using a loan from her employer, once by using money from her separate account, and once by selling a portion of the purchased stock in order to pay for the remaining stocks. The dispute here involves the characterization of the stocks resulting from the options exercised with Beckmann's separate property. Chumbley contends that the stocks are community property, and Beckmann contends that the stocks are her separate property.

We hold that, analogous to the mortgage rule, stock purchased using separate funds and community stock options will be divided upon the rates of separate and community assets used to acquire the stock at the time it was purchased. We reverse the Court of Appeals and remand to the trial court for redistribution, using a pro rata characterization of the stocks acquired in the May 1993 option exercise.

## FACTS

Beckmann and Chumbley married in 1984. During their marriage, Beckmann earned a doctorate degree in biochemistry and pharmacology in 1985 and was hired by Immunex

4

Corporation, a Seattle biotechnology firm, in 1988. She remained employed by Immunex until 1995. Part of Beckmann's compensation from Immunex took the form of options to purchase the corporation's stock at a preferred price. Beckmann exercised the stock options on three occasions. In December 1992, she purchased 1,600 shares of stock, financed by a loan from Immunex. In May 1993, she again purchased 1,600 shares, this time by funding the purchase with approximately $38,391 of money from her separate account ($25,392 to purchase the stock and approximately $12,999 in taxes). Report of Proceedings (RP) at 200. Beckmann's separate funds consisted of money she inherited from her father upon his death in 1991, and she kept her separate property in an account with Northern Trust. The third transaction occurred in June 1993, when Beckmann exercised options through a cashless transaction, where she purchased 1,000 shares and immediately resold 359 of the shares in order to pay for the purchase and taxes. The purchase resulted in a net acquisition of 641 shares.

Chumbley and Beckmann dissolved their marriage after a four-day trial in May 2000. The trial court awarded Beckmann the stocks resulting from the options exercised in May 1993. The court characterized the stocks as Beckmann's separate property because she used her separate assets, which were traceable and identifiable, to purchase the stocks. Clerk's Papers (CP) at 61. The court, however, recognized that the options used to purchase the stock were community property and accordingly, compensated Chumbley with an offset in other assets for the value of the stock options at the time of exercise (approximately $51,000). CP at 60.

Chumbley appealed, contending that the stocks resulting from the May 1993 option exercise are community property because Beckmann obtained the stocks by exercising a community property option. The Court of Appeals agreed, holding that the exercise of the options with separate property did not extinguish the community's interest and

that the community has an interest in the resulting stocks, as well as the options. *In re Marriage of Chumbley*, 110 Wn. App. 871, 877, 43 P.3d 53 (2002). The court determined that Beckmann was entitled, at most, to a lien for her separate contribution and remanded for the trial court to redistribute the property, with the stocks at issue characterized as community property. *Id.* at 878.

Beckmann sought review by this court, challenging the characterization of the stock as community property. We accepted review. *In re Marriage of Chumbley*, 147 Wn.2d 1019 (2002).

## ANALYSIS

■ A trial court's characterization of property as community or separate is reviewed de novo. *In re Marriage of Skarbek*, 100 Wn. App. 444, 447, 997 P.2d 447 (2000).

■ In Washington, it is presumed that assets acquired during marriage are community property. *Dean v. Lehman*, 143 Wn.2d 12, 19-20, 18 P.3d 523 (2001); Harry M. Cross, *The Community Property Law in Washington (Revised 1985)*, 61 WASH. L. REV. 13, 28 (1986); RCW 26.16.030. To rebut the presumption, a party must present clear and convincing evidence that the acquisition fits within a separate property provision. *Dean*, 143 Wn.2d at 19-20; Cross, 61 WASH. L. REV. at 29.[1] The legislature defines separate property as property acquired before marriage or acquired after marriage by gift, bequest, devise, or descent. RCW 26.16.010, .020; *Brown v. Brown*, 100 Wn.2d 729, 737, 675 P.2d 1207 (1984). Separate property will remain separate property through changes and transitions, if the separate property remains traceable and identifiable; however, if the property becomes so commingled that it is impossible to distinguish or apportion it, then the entire amount becomes

---

[1] In Washington, a rebuttable presumption arises that property acquired with separate funds during the marriage is a gift to the community. *In re Marriage of Hurd*, 69 Wn. App. 38, 51, 848 P.2d 185 (1993). In the case before us, neither party contends Beckmann's separate funds used to purchase the stocks were a gift, and the testimony of both spouses is sufficient to rebut the presumption.

community property. *In re Marriage of Pearson-Maines*, 70 Wn. App. 860, 865, 855 P.2d 1210 (1993). As this court has explained before:

> "[T]he right of the spouses in their separate property is as sacred as is the right in their community property, and when it is once made to appear that property was once of a separate character, it will be presumed that it maintains that character *until some direct and positive evidence to the contrary is made to appear.*"

*In re Dewey's Estate*, 13 Wn.2d 220, 226-27, 124 P.2d 805 (1942) (quoting *Guye v. Guye*, 63 Wash. 340, 352, 115 P. 731 (1911)). The burden is on the spouse claiming separate funds to clearly and convincingly trace them to a separate source. *Skarbek*, 100 Wn. App. at 448.

■ Property acquired during marriage has the same character as the funds used to purchase it. *In re Marriage of Zahm*, 138 Wn.2d 213, 223, 978 P.2d 498 (1999); *In re Marriage of Short*, 125 Wn.2d 865, 870, 890 P.2d 12 (1995); Cross, 61 WASH. L. REV. at 27-28. In determining the character of stock purchased pursuant to a stock option, "the use or non-use of marital funds for the purpose of exercising the option may be of some significance." Robert J. Durst II, *Stock Options: A Significant but Unsettled Issue in the Distribution of Marital Assets*, 17 J. AM. ACAD. MATRIM. L. 275, 279 n.10 (2001). It is undisputed that the money used to purchase the stocks in question came from Beckmann's trust account and were her separate funds. Moreover, it is undisputed that the stock options which allowed the purchase at the preferred price were community property. Thus, Beckmann effectively purchased the stocks using two distinct assets, the community options and her separate property.

Chumbley argues that the stocks are community property, deriving their character from the community options exercised to purchase the stocks, and he contends that Beckmann is entitled to a lien on these stocks for her separate contribution in their purchase, relying on *In re*

*Marriage of Sedlock*, 69 Wn. App. 484, 849 P.2d 1243 (1993). Unfortunately, *Sedlock* does not support his position.

In *Sedlock*, the court had to decide the character of warrants to purchase stock at a certain price (comparable to stock options), which initially were purchased with community funds and on community credit. *Id.* at 506. The husband claimed that since he paid the remaining balance on the stocks with his postseparation earnings, he was entitled to a separate proportionate share of the stocks. *Id.* The Court of Appeals disagreed, recognizing that "[p]roperty is characterized as of the date of its acquisition," *id.* (citing *Burch v. Rice*, 37 Wn.2d 185, 190, 222 P.2d 847 (1950)), and the test of character is " 'whether it was acquired by community funds and community credit, or separate funds and the issues and profits thereof,' " *id.* (quoting *Katterhagen v. Meister*, 75 Wash. 112, 115, 134 P. 673 (1913)). The investments in *Sedlock* were acquired using community funds and on community credit; thus, the husband was entitled to a dollar for dollar reimbursement for the payments he made *after* the stock purchase.

This case presents the court with a different issue in that we must determine the effect of using separate funds and community funds to initially acquire the stocks, not the effect of later separate payments toward property that has already been characterized as community.

Precedent addressing stock options is scarce. However, cases involving real property purchased with both separate and community funds, and the resulting characterization of the property, provide useful guidance by analogy. The "mortgage rule," used to determine the character of real property, states:

> [W]here the buyer acquires legal title at the outset in exchange for a cash payment and an obligation to pay the remainder of the purchase price, the fractional share of the ownership represented by the cash payment will be owned as the cash was owned, and the character of ownership of the balance will be determined by the character of the credit pledged to secure the funds to pay the seller or to secure payment to the seller. It does

8

not matter that funds of a different character are subsequently used to pay the obligation; the character of the asset is determined by the character of the cash and of the obligation at the time legal title (and ownership) is obtained.

Cross, 61 WASH. L. REV. at 40 (footnotes omitted); *see also Zahm*, 138 Wn.2d at 224; *In re Estate of Finn*, 106 Wash. 137, 143-45, 179 P. 103 (1919); *In re Estate of Parker*, 153 Wash. 392, 394-96, 279 P. 599 (1929) (where down payment is made with separate funds and community takes on the remaining mortgage, property is separate to the extent of the separate down payment). Similarly, this court has long held that real property purchased with both community funds and clearly traceable separate funds will be divided according to the contribution of each. *See Estate of Dewey*, 13 Wn.2d at 227 (where husband paid portion of purchase price with separate funds, he received as separate property an undivided fractional part of the real property in the ratio of funds contributed); *In re Estate of Williams*, 145 Wash. 19, 24, 258 P. 851 (1927) (evidence clear that $11,000 of separate property was paid and to that extent the property was separate property).

Of note, the Court of Appeals in *Sedlock* applied the same reasoning to characterize the stocks purchased with community property and community warrants as community property. 69 Wn. App. at 506-07. The character of the stocks did not change when the husband subsequently paid off the debt with his separate funds. *Id.* This conforms to the general rule that "the character of the asset is determined by the character of the cash and of the obligation at the time legal title (and ownership) is obtained." Cross, 61 WASH. L. REV. at 40. The mortgage rule recognizes that the purchase of property on credit involves the contribution of two distinct and separate assets—the funds used for the down payment and the community credit used to secure the loan.

We find that an analogous rule should apply when a spouse clearly meets the burden of proving that funds used to exercise community stock options were separate and that no loan or gift to the community was intended. In

this situation, as in *Sedlock,* the long established rules regarding real property characterization provide a reasoned analysis, giving effect to the long-standing principle that the character of separate property continues through transitions where it can be traced and identified.

Chumbley urges, though, that allowing a pro rata distribution under these circumstances would permit the more sophisticated spouse to manipulate community property and frustrate the underlying principles of community property law. We do not agree. Initially, the question of management and control of assets is a matter for the legislature. RCW 26.16.030 specifies that "[e]ither spouse, acting alone, may manage and control community property, with a like power of disposition as the acting spouse has over his or her separate property," unless the property falls under one of the six listed exceptions. Stock and stock options do not fall under any of the enumerated exceptions and, accordingly, are not property that requires the consent of both spouses for management. RCW 26.16.030.

Moreover, current law already answers Chumbley's argument. A spouse is required to act in good faith when managing community property, and a disposition of community funds is within the scope of a spouse's authority to act alone only if he or she acts " 'in the community interest.' " *Schweitzer v. Schweitzer,* 81 Wn. App. 589, 597, 915 P.2d 575 (1996) (quoting *Hanley v. Most,* 9 Wn.2d 429, 461, 115 P.2d 933 (1941)); *see also Peters v. Skalman,* 27 Wn. App. 247, 251, 617 P.2d 448 (1980) ("it is a special form of partnership with the spouses not only owing each other the highest fiduciary duties, but also with [each spouse] charged with the statutory duty to manage and control community assets for the benefit of the community") (citing Harry M. Cross, *The Community Property Law in Washington,* 49 WASH. L. REV. 729 (1974)). When either spouse exercises discretion in the community interest, the nonacting spouse is without power to frustrate the other's acts; good faith rather than good judgment is the rule. Cross, 61 WASH. L. REV. at 82-83.

Beckmann had the authority and the power to dispose of or manage the stock options for the benefit of the community. She testified that the community would lose the options if they were not exercised because the community lacked the funds to exercise the options; therefore, she used her separate funds to purchase the shares. RP at 199. If she had not, the community would have lost any future value from the options, and the options themselves would have become worthless. Under these facts, the only conclusion that can be reached is that she acted in good faith.

We believe our result conforms to the most basic of investing principles—that reward is related directly to the amount of risk taken. A spouse who contributes separate funds for the purpose of exercising stock options takes an additional risk, and the reward should be proportionate to that additional risk. A pro rata characterization of the stocks accomplishes this proportionate disposition, yet still fully compensates the community for the value of the options at the time of exercise. Furthermore, the community receives a proportionate share in any future growth in the value of the acquired stocks.

## CONCLUSION

Beckmann has met her burden of proving that her separate funds were used to exercise the community stock options. We find that the character of the resulting stock should be determined based upon the rates of separate and community assets expended to acquire the stock. Accordingly, we adopt a pro rata characterization of the stocks, and reverse and remand to the trial court for redistribution.

ALEXANDER, C.J., and JOHNSON, SANDERS, IRELAND, BRIDGE, CHAMBERS, OWENS, and FAIRHURST, JJ., concur.