# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of<br><br>PAUL BRUCE BYERS,<br><br>                       Respondent,<br><br>   And<br><br>MIKAYLA ROCHELLE BYERS,<br><br>                     Appellant. | No. 54382-6-II<br><br><br><br><br><br>UNPUBLISHED OPINION |

CRUSER, J. — Mikayla Byers appeals the final divorce order, findings of fact and conclusions of law about a marriage, and the order denying her motion for reconsideration entered following her divorce from Paul Byers. Mikayla[1] argues that (1) the trial court abused its discretion when it allocated the parties' property, (2) the trial court erred when it characterized real property as Paul's separate property, (3) the trial court abused its discretion in limiting her spousal maintenance to two years of decreasing maintenance beginning at $2,500, and (4) the trial court abused its discretion in denying her request for attorney fees.

We hold that (1) the trial court abused its discretion when it allocated the parties' property, (2) the trial court properly characterized the real property as Paul's separate property, (3) the trial

---

[1] For clarity, we refer to Mikayla and Paul Byers by their first names. No disrespect is intended.

court abused its discretion when it awarded two years of decreasing spousal maintenance, and (4) the trial court abused its discretion when it denied Mikayla's request for attorney fees.

Accordingly, we reverse in part and affirm in part and remand for further consideration.

FACTS

I. PAUL AND MIKAYLA'S MARRIAGE

Mikayla and Paul Byers were married in 2003. They had a daughter during their marriage. Mikayla and Paul separated after a 16-year marriage.[2]

When Paul and Mikayla met, Mikayla was a student at the University of Washington working on obtaining two bachelor's degrees, one in biology and another in aquatic and fishery sciences. Paul was self-employed in his own chiropractic practice, Byers Chiropractic and Massage (BCM).

After graduating with her bachelor's degrees, Mikayla was offered an internship in her field of study, but she rejected the internship to assist Paul with his practice. Mikayla continued to assist Paul in developing his practice after they married, with her tasks ranging from establishing marketing programs, filling in for staff members, billing, renovations, and others. Mikayla did not receive a salary or payment for her work in Paul's practice, because she "never technically worked there." 8 Verbatim Report of Proceedings (VRP) at 662. However, she was "very involved for the whole marriage," and never pursued her own career independent of Paul's practice. *Id.* In addition, Mikayla homeschooled their daughter.

---

[2] The length of the marriage is based on the trial court's Finding of Fact 13, which is unchallenged. *In re Marriage of Akon*, 160 Wn. App. 48, 57, 248 P.3d 94 (2011) (unchallenged findings are verities on appeal).

Since starting his practice in 1996, Paul operated his business from a rented location in Kent, Washington. In 2000, several years before Paul married Mikayla, Paul purchased the real property on which his business was located. Paul purchased the property using a home equity line of credit to make the down payment and entered into an agreement to pay the remaining purchase price directly to the seller. The house that served as collateral for the home equity line of credit was a house that Paul purchased in 1988 and owned free and clear of any mortgage.

The loan on the business property was paid off in 2005, after the parties were married, with a credit card that was a business card for BCM, and with rent payments collected from BCM. In addition, the home equity line of credit used for the down payment was paid from accounts and with credit cards that belonged to both Paul and Mikayla as well as rent collected from BCM. Rent payments from BCM were kept in a personal account that belonged to both Paul and Mikayla. Paul received a statutory warranty deed after repaying the obligation on the business property to the seller. The statutory warranty deed stated that the property was conveyed to Paul as his separate estate.

Repairs and maintenance for the business property were paid using a BCM account. The BCM account was also often used to pay for Paul and Mikayla's personal expenses, such as gas, insurance, travel, and car payments. For at least five or six years, Mikayla's name was the sole name on the BCM business account.

In 2017, Paul formed Living Well Properties LLC, to act as a real estate holding company with the business property as its only asset. Paul was the sole member of the LLC. Mikayla was not a member of Living Well Properties or otherwise involved in the LLC. Living Well Properties and BCM executed a commercial lease wherein BCM would pay rent to Living Well Properties.

3

Rent payments made by BCM to Living Well Properties were also kept in an account that Paul and Mikayla shared.

## II. DISSOLUTION PROCEEDINGS

Several months after the parties separated in 2018, Paul filed for dissolution. Under an informal agreement, Paul paid Mikayla a monthly payment of $6,000 following their separation in January 2018. The trial court later entered a temporary order that required Paul to pay spousal maintenance of $4,500 per month.

The trial court proceedings were heavily contentious. The trial court remarked that "at various times during this litigation both of the parties have been intransigent resulting in unnecessary delays, misuse of community funds, and noncompliance of valid court orders." Clerk's Papers (CP) at 216.

During trial, the parties addressed an Ally Bank account that had belonged to the community during their marriage and that contained $319,914 at the date of separation. Paul withdrew approximately $80,000 from of that account after separation but prior to trial. He asserted that these withdrawals were made for the benefit of the community and should not be considered a distribution in his favor. Mikayla argued that those withdrawals should be characterized as a pre-distribution of community property to Paul. Both parties agreed that Mikayla should retain the funds in that account. Mikayla also withdrew funds the Ally Bank account to pay for legal expenses related to the dissolution.

In addition, Paul and Mikayla disputed the character of the business property on which BCM was located. Paul asserted that the real property was his separate property and remained so,

while Mikayla contended that the property had transmuted to community property because the property had become extensively commingled into the community.

Mikayla requested spousal maintenance, proposing that Paul pay her $6,000 per month. Mikayla argued that the award was reasonable given her need and Paul's ability to pay that amount based on his income. She also requested that the trial court award her attorney fees based on her need under RCW 26.09.140 and Paul's intransigence during the trial court proceedings.

### III. FINAL ORDERS

With regard to the Ally Bank account, the trial court ruled that $80,000 should be awarded to Paul and $239,914 should be awarded to Mikayla. In the trial court's findings, the trial court found that the value of the account was $319,914. In discussing Paul's separate property, with regard to the Ally Bank account, the trial court stated that Paul would be awarded "[t]he sum of $80,000," and that Mikayla would retain "[a]ll the funds in the Ally Bank" account "after the payment of $80,000" to Paul. CP at 2420, 2422.

The trial court found that BCM was community property, and it ordered Paul to pay Mikayla 50 percent of the value of that business within one year of its entry of final orders. The trial court provided further that the amount due to Mikayla for her share of BCM's value should be offset by the $80,000 that was due to Paul from the Ally bank account.

The trial court characterized the real property in which BCM was located was Paul's separate property. It found that the property had a value of $385,000.

The trial court also determined that Mikayla had retained a $12,000 tax refund from the parties' joint tax filing in 2017. It ordered Mikayla to pay Paul $6,000 of that refund. However,

Mikayla and Paul did not receive a refund on their taxes from the Internal Revenue Service (IRS) in 2017. Instead, they were required to pay $2,904 to the IRS.

Finally, the trial court agreed with Mikayla that an award of spousal maintenance was appropriate. However, it found that Mikayla had marketable skills, and that "[h]er efforts of seeking employment have been less than credible." *Id.* at 2416. The trial court referred to its finding in the child support calculation that Mikayla was voluntarily underemployed. The trial court considered Mikayla's age and health, finding that Mikayla was 39 years old at the time and that she was in good health. The trial court further found that the parties had a "middle-class standard of living during the marriage" and that the marriage was 16 years long. *Id.* Due to the allocation of the parties' property, the trial court found that the "financial resources" of the parties was about equal on dissolution. *Id.* The trial court further noted that Mikayla had already received maintenance for two years prior to entry of final orders. Based on the foregoing, the trial court awarded Mikayla two years of maintenance, with $2,500 per month payment for the first year, and $1,500 per month payment for the second year.

In the trial court's order imposing a child support payment obligation on Paul, the trial court imputed income to Mikayla based on her rate of pay as a part time employee at her daughter's school. The trial court determined that Mikayla's monthly income, including her spousal maintenance of $2,500 per month, was just under $6,000. Paul's net monthly income, according to the child support worksheet, was over $21,000.

The trial court also denied Mikayla's request for attorney fees. It explained that because both parties had been intransigent, they would each be responsible for paying their own fees. The trial court did not address Mikayla's argument requesting fees under RCW 26.09.140.

6

In total, the trial court awarded Paul $680,146.50 in community assets, plus the real property on which BCM was located which had a value of $365,000. Thus, including both community and separate property, Paul was awarded $1,045,146.50 in total assets.

The trial court awarded Mikayla a total of $829,206 in community assets. That total was based on the trial court's determination that Mikayla would receive $239,914 from the Ally bank account. The trial court also did not include in its calculation various funds from the community that were pre-distributed to Mikayla after separation but before trial. Factoring in the pre-distributed funds, Mikayla's total award was $854,213.

Mikayla moved for reconsideration of the trial court's order awarding Paul a future payment of $80,000 as an offset related to his portion of the Ally Bank account funds. Mikayla also argued that the trial court made a clerical error in distributing the $12,000 tax refund because the parties did not receive a refund on their 2017 return. The trial court denied Mikayla's motion without comment.

Mikayla appeals the trial courts final orders and findings of fact and conclusions of law, as well as its order denying her motion for reconsideration.

## DISCUSSION

### I. STANDARD OF REVIEW

At issue before us are several aspects of a trial court's decision in a marriage dissolution action. With regard to review of dissolution proceedings, the supreme court has observed that "[t]he emotional and financial interests affected by such decisions are best served by finality." *In re Marriage of Landry*, 103 Wn.2d 807, 809, 699 P.2d 214 (1985). Accordingly, "[t]he spouse

who challenges such decisions bears the heavy burden of showing a manifest abuse of discretion on the part of the trial court." *Id.*

The trial court has abused its discretion where its decision is manifestly unreasonable or is based on untenable grounds or reasons. *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005).

> "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard."

*In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997).

Where, as here, the trial court has weighed the evidence, our role on review is to determine whether substantial evidence supports the findings of fact, and in turn, whether the findings support the trial court's conclusions of law. *In re Marriage of Rockwell*, 141 Wn. App. 235, 242, 170 P.3d 572 (2007). "'Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise.'" *Id.* at 242 (quoting *In re Marriage of Griswold*, 112 Wn. App. 333, 339, 48 P.3d 1018 (2002)). We do "'not substitute [our] judgment for the trial court's, weigh the evidence, or adjudge witness credibility.'" *Id.* (alteration in original) (quoting *In re Marriage of Greene*, 97 Wn. App. 708, 714, 986 P.2d 144 (1999)). If a trial court's decision is based on unsupported findings, or if the findings do not satisfy the applicable legal standard, the trial court's decision amounts to an abuse of discretion, warranting reversal. *Muhammad*, 153 Wn.2d at 803; *Littlefield*, 133 Wn.2d at 47.

## II. DIVISION OF COMMUNITY PROPERTY

Mikayla argues that the trial court abused its discretion in allocating the parties' community property when it awarded Paul a second payment of $80,000 from the Ally bank account and when it distributed a $12,000 tax refund.[3] We agree.

### A. LEGAL PRINCIPLES

In a marriage dissolution proceeding, a trial court is tasked with disposing the parties' property and liabilities, "'either community or separate, as shall appear just and equitable after considering all relevant factors.'" *Muhammad*, 153 Wn.2d at 803 (quoting RCW 26.09.080). The trial court must consider a list of nonexclusive factors set forth in RCW 26.09.080, including "(1) [t]he nature and extent of the community property; (2) [t]he nature and extent of the separate property; (3) [t]he duration of the marriage . . . ; and (4) [t]he economic circumstances of each spouse . . . at the time the division of property is to become effective." RCW 26.09.080; *In re Marriage of Zahm*, 138 Wn.2d 213, 219, 978 P.2d 498 (1999).

Trial courts are vested with "broad discretion" to determine a just and equitable allocation of property based on the particular circumstances in a case. *Rockwell*, 141 Wn. App. at 242. Mathematical precision is not required in a just and equitable distribution; instead, a trial court must ensure "'fairness, based upon a consideration of all the circumstances of the marriage, both

---

[3] Mikayla did not assign error to any of the trial court's findings as required under RAP 10.3(g), which states that "[a] separate assignment of error for each finding of fact a party contends was improperly made must be included with reference to the finding by number." Paul contends that we must therefore accept the entirety of the trial court's findings as verities. Despite Mikayla's technical flaw, we exercise our discretion to address her challenges to the trial court's factual findings. Mikayla has made a sufficiently detailed challenge to the trial court's factual findings and has clearly described her challenge in her statement of the issues and her argument to warrant review. RAP 10.3(g); *State v. Olson*, 126 Wn.2d 315, 323, 893 P.2d 629 (1995).

past and present, and an evaluation of the future needs of parties.'" *Zahm*, 138 Wn.2d at 219

(quoting *In re Marriage of Crosetto*, 82 Wn. App. 545, 556, 918 P.2d 954 (1996)).

B. APPLICATION

      1. $80,000 Ally Bank Payment

The trial court's decision to award Paul a second payment of $80,000 from the Ally Bank account was an abuse of discretion because it was based untenable grounds and untenable reasons. The trial court's error was more significant than mere mathematical imprecision; instead, it undermined the fairness of its property distribution. *See id*.

Prior to Mikayla and Paul's separation, the Ally Bank account had a value of $319,914. After separation, Paul withdrew approximately $80,000 from that account. Mikayla withdrew funds from that account for legal expenses related to the dissolution. The trial court ordered Mikayla to reimburse Paul half of the amount she withdrew for her legal fees.

At trial, Paul testified that the value of the Ally Bank account was "200, 214, something like that." 2 VRP at 155. In a similar recognition of the value of the Ally account at trial, Mikayla requested that the trial court divide the Ally Bank account and award the $80,000 that Paul had already withdrawn to Paul, allowing her to retain the remaining $239,914. The fact that Paul and Mikayla withdrew funds from the Ally Bank account, reducing its balance from $319,914, was not in dispute.

There was, however, a dispute at trial regarding whether Paul withdrew the funds for personal use or for the benefit of the community and whether those funds should be allocated to Paul as a pre-distribution of community assets. Mikayla asserted that the funds should be considered a pre-distribution of community assets and that Paul should be allocated those funds,

whereas Paul contended that because his withdrawals were made for the benefit of the community, they should not be considered a pre-distribution and they should not be allocated to him.

In its oral ruling regarding Mikayla and Paul's Ally Bank account, the trial court adopted Mikayla's proposal, stating that $80,000 would be allocated to Paul, while $239,914 would be allocated to Mikayla. The trial court entered a finding that the value of the Ally Bank account was $319,914, and it stated in its final order that Paul was to receive one payment of $80,000 from the Ally bank account, and that Mikayla was to retain the remainder. The sum of $80,000 plus $239,914 is $319,914.

However, the trial court also distributed an additional $80,000 to Paul from the Ally Bank account beyond that discussed in its oral ruling. Because Paul was required to pay Mikayla $385,000 representing her share of BCM's value, the court stated in its order that "[t]he $80,000 payable by [Mikayla] to [Paul] from the Ally Bank account shall be offset against this sum reducing it to $305,000." CP at 2425. Therefore, because the payment of $80,000 to Paul would offset the amount due to Mikayla at a future date, the trial court treated this $80,000 sum as a future distribution to Paul rather than, as had been discussed at trial, a pre-distribution of funds that Paul had already received from that account.

Paul contends that the trial court intended to award him a future sum of $80,000 from that account, that it deliberately valued the Ally Bank account as of the date of separation rather than as of the date of trial, and that the trial court did not agree with Mikayla or find that his $80,000 withdrawal was a pre-distribution. Paul's assertions are without merit. The trial court's finding that the value of the Ally Bank account was $319,914, and its order stating that Paul should receive

11

a single payment of $80,000 from the Ally Bank account was consistent with its oral ruling treating Paul's $80,000 as a pre-distribution and allowing Mikayla to keep the remaining $239,914.

The trial court, however, created an internal conflict between its findings and its order when it provided for a future distribution of $80,000 to Paul from the Ally Bank account. The undisputed facts reflect that Paul had already withdrawn approximately $80,000 and that the account balance was no longer $319,914. Therefore, the trial court's award of a future distribution of $80,000 reflected a second payment to Paul, and it left the first $80,000 Paul had withdrawn post-separation unaccounted for.

The trial court's order allocating only a single payment from the Ally Bank account to Paul, leaving the remainder to Mikayla, was thus inconsistent with its order allocating a future disbursement. Moreover, the trial court's finding that the value of the account was $319,914, the balance before Paul had withdrawn $80,000, is also inconsistent with its order awarding a future disbursement of $80,000.

Given that $80,000 represents approximately 10 percent of the total assets allocated to Mikayla in the dissolution, the amount is not insignificant and implicates the fairness of the entire property allocation. *See Zahm*, 138 Wn.2d at 219. The trial court's order granting Paul a future distribution of $80,000 was based on untenable grounds and amounted to a manifest abuse of discretion. *See Muhammad*, 153 Wn.2d at 803; *Littlefield*, 133 Wn.2d at 46-47.

2. $12,000 Tax Refund

The trial court abused its discretion when it found that Mikayla received a tax refund in 2017 totaling $12,000, and when it ordered Mikayla to pay $6,000 of that refund to Paul. The record reflects that the parties jointly filed taxes in 2017 and that they owed the IRS approximately

12

$3,000. Therefore, the trial court's finding that Mikayla retained a $12,000 tax refund from the 2017 joint tax filing was not supported by substantial evidence and its decision to award Paul $6,000 from that refund was based on untenable grounds. *See Littlefield*, 133 Wn.2d at 46-47.

Paul does not dispute that the trial court made an error with regard to a 2017 tax refund, but he asserts that the error is minimal and does not compel reversal of an otherwise fair distribution. First, including the temporary spousal maintenance Mikayla was awarded, her total monthly income is less than $6,000. An erroneous award of $6,000 to Paul is not necessarily a minimal error from her perspective even if it does not represent a significant share of the of the parties' total assets. Second, because the trial court erred with respect to the $80,000 Ally Bank account payment, we do not reverse the property distribution on this issue alone.

### III. REAL PROPERTY CHARACTERIZATION

Mikayla argues that the trial court erred when it characterized real property in which BCM was located as Paul's separate property because the real property had become comingled with the parties' community property and paid for by community assets. We disagree.

#### A. LEGAL PRINCIPLES

When distributing properties and liabilities in a marriage dissolution action, the trial court must characterize the property at issue as either community property or separate property. *In re Marriage of Kile*, 186 Wn. App. 864, 875, 347 P.3d 894 (2015). A property's status as either community property or separate property is determined based on its character at the date of its acquisition. *In re Estate of Borghi*, 167 Wn.2d 480, 484, 219 P.3d 932 (2009) (plurality opinion).

In the context of real property, courts employ the "mortgage rule" to determine the character of the property at acquisition. *In re Marriage of Chumbley*, 150 Wn.2d 1, 7, 74 P.3d 129

(2003). Under the mortgage rule, where title to property is acquired with a down payment plus an obligation to pay the remainder of the purchase price, the property is characterized by the character of the down payment and of the legal obligation when title to the property is obtained. *Id.* at 7-8.

If a property is separate at acquisition, "a presumption arises that it remained separate property in the absence of sufficient evidence to show an intent to transmute the property from separate to community property." *Borghi*, 167 Wn.2d at 484. Evidence sufficient to rebut the presumption must be "'direct and positive,'" and it must show that the spouse who owned the separate property intended to change the character of the property from separate to community property. *Borghi*, 167 Wn.2d at 484-85 (quoting *Guye v. Guye*, 63 Wash. 340, 352, 115 P. 731 (1911)).

Generally, sufficient evidence of an intent to transmute separate property into community property entails a writing such as a quit claim deed or a community property agreement. *Id.* at 485. Evidence such as "[l]ater community property contributions to the payment of obligations, improvements upon the property, or any subsequent mortgage of the property may in some instances give rise to a community right of reimbursement protected by an equitable lien, but such later actions do not result in a transmutation of the property from separate to community property." *Borghi*, 167 Wn.2d at 491 n.7.

We review a trial court's decision characterizing property de novo. *Chumbley*, 150 Wn.2d at 5. A spouse who asserts that separate property has been acquired by the community bears the burden of proving the transformation in character by clear and convincing evidence. *In re Marriage of Skarbek*, 100 Wn. App. 444, 447, 997 P.2d 447 (2000).

B. APPLICATION

Here, under the mortgage rule, the real property was Paul's separate property at its acquisition. *See Chumbley*, 150 Wn.2d at 7-8. Paul purchased the property and acquired title to it before the parties were married. He made the purchase by obtaining a home equity line of credit for the down payment against a house that Paul purchased in 1988, well before the parties were married in 2003. Paul alone was obligated for the remaining payments on the building due to the seller, and Mikayla was never on the title to the building, nor was she otherwise obligated for the payments. Therefore, the character of both the down payment and the obligation with respect to the real property was separate and belonged to Paul. *See Chumbley*, 150 Wn.2d 1, 7-8.

Mikayla contends that the character of the property transformed to community property because funds used to pay for various expenses related to the property came from community accounts, profits from rents paid on the property were collected in community accounts, and the community contribution to the property rendered any separate contribution by Paul prior to marriage insignificant. Moreover, Mikayla asserts that Paul intended that the property belong to the community, that the parties regarded the property as community property, and that Paul described the property as belonging to both of them in a declaration that he filed during the dissolution proceedings. These arguments fail.

The use of common or commingled funds to pay expenses related to a property does not transform the separate property to community property. Under the mortgage rule, "'that funds of a different character are subsequently used to pay the obligation,'" does not change the character of real property. *Id.* (quoting Harry M. Cross, *The Community Property Law in Washington* (Revised 1985), 61 WASH. L. REV. 13, 40 (1986)). In addition, improvements made by the

community or additional mortgages taken out on the property by the community likewise do not transform its character. *Borghi*, 167 Wn.2d at 491 n.7. Thus, the fact that the community was invested in the business property in various respects did not transform its character from Paul's separate property to community property. *See Chumbley*, 150 Wn.2d at 7-8; *see also Borghi*, 167 Wn.2d at 491 n.7.

Mikayla relies on *In re Estate of Buchanan*, 89 Wash. 172, 154 P. 129 (1916), to argue that extensive community contributions to separate property can transform the character of that property where the contributions eclipse the separate investment. Her reliance on *Buchanan* is unavailing.

The disputed property in *Buchanan* began as a small stock investment of separate funds by one spouse into a newly incorporated lumber company that, after the personal efforts of the other spouse who formed the lumber company, increased substantially in value. 89 Wash. at 179. The court noted that the personal property underwent "many changes" after it was initially acquired. *Id.* at 180. As a result, the court held that the general rule, which provides that "specific real or personal property, once becoming separate property, remains so, unless by voluntary act of the spouse owning it its nature is changed," was of limited assistance in determining the character of the property involved in that case. *Id*. at 179. The court delineated the issue before it as pertaining to "when profits or gains" in the value of the disputed property, "resulting largely from personal efforts of one of the spouses becomes separate or community property." *Id.* It reasoned that the gains and profits from that initial investment were community property, and because the original funds invested had "become so intermingled with community property," they lost their separate identity and became subsumed by the community. *Id.* at 181.

16

*Buchanan* is therefore distinguishable because, as the court took pains to note, the property at issue in that case was personal as opposed to real property. *Id.* at 179-80. Unlike in *Buchanan*, any increase in the value of the real property in this case was not so transformative of the business property's original character that it caused the property to lose its separate identity in a manner similar to a stock investment. *See id.* at 181. Given that the character of the real property itself is at issue here, and not only the increased value derived therefrom, the traditional rule that requires direct evidence of intent to transform the character of the property applies. *See id*. at 179.

To rebut the presumption that separate property remains separate, Mikayla was therefore required to present "'direct and positive'" evidence that Paul intended to transform the character of the property to community property. *See Borghi*, 167 Wn.2d at 484 (quoting *Guye*, 63 Wash. at 352). Mikayla has not identified any such evidence. To the extent that she relies on Paul's declaration wherein he stated, "[w]e own the real estate on which the business is located," as evincing Paul's intent that the property belong to the community, that evidence was insufficient. CP at 707 (emphasis added). This single remark does not address Paul's intent to transform the character of his separate property.

In addition, the record indicates that Paul intended to keep the business property as his separate property. For example, after the parties married, Paul received a statutory warranty deed, reflecting that he paid off the mortgage obligation in full. The deed stated that the property was conveyed to "Paul B. Byers, as his separate estate." Ex. 2. In addition, in 2017, before the parties separated, Paul formed Living Well Properties LLC to serve a real estate holding company for the business property. Paul was the sole member of that LLC, and Mikayla was never a member of that LLC. The fact that the community business paid rent for the property to the LLC, or that rent

17

proceeds collected by Living Well LLC were kept in a community account, did not evince Paul's intent to transform the character of the real property itself.

Even assuming, arguendo, that the funds expended and acquired in relation the property were extensively commingled, such evidence does not satisfy the standard for demonstrating transmutation of real property as required by the supreme court in *Borghi* because it did not establish Paul's intent. 167 Wn.2d at 484-85. Consequently, Mikayla has not satisfied her burden of setting forth evidence demonstrating Paul's intent to transform the character of his separate property to community property. The trial court properly characterized Paul's business property as separate property.

IV. SPOUSAL MAINTENANCE

Mikayla argues that the trial court abused its discretion when it limited her spousal maintenance award to two years of decreasing maintenance. We agree.

A. LEGAL PRINCIPLES

Trial courts have broad discretion to award spousal maintenance in accordance with RCW 26.09.090. *In re Marriage of Washburn*, 101 Wn.2d 168, 179, 677 P.2d 152 (1984). The court must consider each of the factors listed in RCW 26.09.090(1), including:

> (a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;
>
> (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;
>
> (c) The standard of living established during the marriage or domestic partnership;
>
> (d) The duration of the marriage or domestic partnership;

18

(e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and

(f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

While the trial court is required to consider each factor, the list in RCW 26.09.090(1) is nonexclusive, and the trial court is not required to make specific factual findings with regard to each factor. *In re Marriage of Anthony*, 9 Wn. App. 2d 555, 564, 446 P.3d 635 (2019). Under RCW 26.09.090, "the only limitation placed upon the trial court's ability to award maintenance is that the amount and duration, considering all relevant factors, be just." *Washburn*, 101 Wn.2d at 178.

Because the "duration of the marriage and the standard of living established during the marriage must also be considered," spousal maintenance "is not just a means of providing bare necessities." *Id.* Whether the spouse seeking maintenance is capable of independently meeting his or her need "is only *one* factor to be considered." *Id.* at 179. Instead, spousal maintenance is "a flexible tool by which the parties' standard of living may be equalized for an appropriate period of time." *Id.* at 179. We review a trial court's award of maintenance for abuse of discretion. *Id.*

B. APPLICATION

The trial court awarded Mikayla two years of decreasing spousal maintenance in its final order. Mikayla was set to receive a monthly payment of $2,500 in the first year, and a $1,500 monthly payment in following second year. This spousal maintenance award was an abuse of the trial court's discretion because it was unjust under the circumstances. *Id.* at 179.

Mikayla challenges the trial court's finding that she did not make a credible effort at obtaining employment post dissolution and asserts that she requires additional time to establish her independence. Mikayla contends that although she has two bachelor's degrees, she has never been employed in her very specific field of study, and she has been a stay-at-home mom, focusing her energy toward building Paul's chiropractic practice and raising their daughter. We agree.

The record reflects that Mikayla sacrificed opportunities to pursue an independent career or source of income, and instead assisted Paul in building his successful practice, while raising their daughter. The trial court's ruling shows that it disregarded, without addressing in its findings or oral ruling, the difficulty an individual might face in obtaining employment where that individual has been out of the workforce and focused on providing childcare for nearly 20 years.

In addition, according to the final child support worksheets, Paul earns a net monthly income of over $21,000 from the business that the parties cultivated during their marriage. Mikayla's net monthly income, meanwhile, is reduced to only $4,000, including the income imputed as a result of her voluntary unemployment but excluding the spousal maintenance. The trial court's decision to award Mikayla only two years of decreasing spousal maintenance was unjust when considered with respect to the parties' 16-year marriage and Mikayla's role within in that marriage. Consequently, the trial court abused its discretion in awarding only two years of decreasing spousal maintenance. *Id.*

V. ATTORNEY FEES AT TRIAL

Mikayla argues that the trial court abused its discretion when it declined her request for attorney fees. We agree.

A. LEGAL PRINCIPLES

Need, ability to pay, and equity are the primary considerations for the award of attorney fees in a dissolution action. *In re Marriage of Van Camp*, 82 Wn. App. 339, 342, 918 P.2d 509 (1996). Under RCW 26.09.140, a court may order attorney fees in a dissolution proceeding. This statute provides that a court may order one party to pay reasonable attorney fees, costs, or other professional fees related to the dissolution litigation to the other party "after considering the financial resources of both parties."

The decision to award fees pursuant to RCW 26.09.140 is discretionary. *In re Marriage of Urbana*, 147 Wn. App. 1, 16, 195 P.3d 959 (2008). In determining whether to award fees, the court must "'balance[ ] the needs of the spouse seeking fees against the ability of the other spouse to pay." *Id*. (quoting *In re Marriage of Moody*, 137 Wn.2d 979, 994, 976 P.2d 1240 (1999). "A lack of findings as to either need or ability to pay requires reversal." *In re Marriage of Scanlon*, 109 Wn. App. 167, 181, 34 P.3d 877 (2001).

In addition, a court may award attorney fees based on a party's intransigence, which "is an equitable as opposed to statutory basis for awarding fees." *In re Marriage of Chandola*, 180 Wn.2d 632, 656, 327 P.3d 644 (2014). "'Awards of attorney fees based upon the intransigence of one party have been granted when the party engaged in "foot-dragging" and "obstruction"... or simply when one party made the trial unduly difficult and increased legal costs by his or her actions.'" *Id.* at 657 (alteration in original) (internal quotation marks omitted) (quoting *In re Marriage of Katare*,

175 Wn.2d 23, 42, 283 P.3d 546 (2012)). The party alleging intransigence of another must demonstrate that the opposed party acted in a way that increased the costs of litigation. *In re Marriage of Pennamen*, 135 Wn. App. 790, 807, 146 P.3d 466 (2006).

A court need not consider the parties' resources where intransigence is established. *In re Marriage of Larson*, 178 Wn. App. 133, 146, 313 P.3d 1228 (2013). We review a trial court's "discretionary decision to award or deny attorney fees and the reasonableness of any attorney fee award for an abuse of discretion." *Gander v. Yeager*, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012).

B. APPLICATION

Here, the trial court denied Mikayla's request for fees, ruling that each party will be responsible for its own attorney fees. The court found that "the evidence shows that at various times during this litigation[,] both of the parties have been intransigent[,] resulting in unnecessary delays, misuse of community funds, and noncompliance with valid court orders." CP at 2416.

Mikayla requested attorney fees under RCW 26.09.140. But the trial court did not enter any specific findings regarding Mikayla's need for attorney fees or Paul's ability to pay attorney fees. The trial court's oral ruling was focused only on the parties' respective intransigence and likewise did not address Mikayla's need for fees or Paul's ability to pay them. Consequently, reversal on this issue is necessary so that the trial court can make the requisite factual findings. *See Scanlon*, 109 Wn. App. at 181.

Relying on *In re Marriage of Morrow*, 53 Wn. App. 579, 590, 770 P.2d 197 (1989), Paul contends that because the trial court found Mikayla intransigent, her financial status was irrelevant

and findings under RCW 26.09.140 are unnecessary. This assertion lacks merit and reflects an overly broad reading of *Morrow*.

In *Morrow*, the court explained that intransigence caused by the spouse from whom an attorney award is sought is "[a]n important consideration apart from the relative abilities of the two spouses to pay." 53 Wn. App. at 590. In such circumstances, whether the spouse seeking an attorney fee award has a financial need for payment is irrelevant. *Id.* That is, the trial court may, within its discretion, award attorney fees to a spouse where the other spouse was intransigent even if the spouse seeking the award had sufficient resources to afford the attorney fees on his or her own. *Id.* The court did not suggest that if the party seeking an award under RCW 26.09.140 has been intransigent during the dissolution proceedings, that spouse is rendered ineligible for a need-based award.

In addition, an award of fees based on intransigence requires a showing that the cost of litigation was needlessly increased by one party's acts during the proceedings. *Pennamen*, 135 Wn. App. at 807. Therefore, even if Paul or Mikayla or both had been intransigent and increased the cost of litigation, that fact does not address whether Mikayla may have been entitled to attorney fees based on need for attorney fees up to the unnecessary expenditure.

Because Mikayla requested fees under RCW 26.09.140, the trial court abused its discretion when it did not enter findings or otherwise address Mikayla's need for fees or Paul's ability to pay the fees.

VI. ATTORNEY FEES ON APPEAL

Mikayla and Paul request attorney fees on appeal. We grant Mikayla's request for attorney fees and deny Paul's request.

A. MIKAYLA'S REQUEST FOR ATTORNEY FEES

In her conclusion, Mikayla requests attorney fees on appeal under RAP 18.1. In seeking an award of attorney fees on appeal, a party is required to include a separate section in their brief devoted to the request. RAP 18.1(b). The section in the brief must provide argument and citation to authority to apprise us of the appropriate grounds on which we may award attorney fees. *Stiles v. Kearney*, 168 Wn. App. 250, 267, 277 P.3d 9 (2012). However, the Rules of Appellate Procedure call for a liberal interpretation, allowing us to waive provisions of the rules "in order to serve the ends of justice." RAP 1.2(a), (c). Therefore, we exercise our discretion to consider Mikayla's request on its merits.

Under RAP 18.1(a), a party may request attorney fees if "applicable law" grants them the right to recover the fees. RCW 26.09.140 grants us discretion to grant attorney fees on appeal in dissolution proceedings. An award of attorney fees under RCW 26.09.140 is based on a consideration of " 'the parties' relative ability to pay' and 'the arguable merit of the issues raised on appeal.' " *In re Marriage of Muhammad*, 153 Wn.2d 795, 807, 108 P.3d 779 (2005) (quoting *In re Marriage of Leslie*, 90 Wn. App. 796, 807, 954 P.2d 330 (1998)).

Mikayla has successfully argued several issues on appeal. In addition, her financial affidavit reflects the need for fees because her monthly expenses exceed her monthly income, even accounting for monthly support payments from Paul. Paul has significant monthly expenses, including monthly payments on a loan that he obtained to pay Mikayla half of BCM's value.

However, Paul also has a considerable net monthly income that exceeds his expenses, and his financial affidavit shows an ability to pay Mikayla's fees. Based on this review, we grant Mikayla's request for attorney fees in an amount to be determined by the court commissioner.

B. PAUL'S REQUEST FOR ATTORNEY FEES

Paul argues that he is entitled to attorney fees on appeal under RCW 26.09.140 in light of his need and Mikayla's ability to pay. He further argues that he is entitled to fees under RAP 18.9(a) because Mikayla's appeal was frivolous. We disagree.

Under RCW 26.09.140 an appellate court may award attorney fees for costs incurred in maintaining an appeal based on "the financial resources of both parties." When a request for fees and costs is made in accordance with RCW 26.09.140, "courts will consider 'the parties' relative ability to pay' and 'the arguable merit of the issues raised on appeal.'" *Muhammad*, 153 Wn.2d at 807 (quoting *In re Marriage of Leslie*, 90 Wn. App. 796, 807, 954 P.2d 330 (1998)).

Here, according to Paul's financial need certificate, he has limited need because of his substantial net monthly income and assets. Although Paul's monthly expenses are high, owing in large part to his repayment obligation on the commercial loan he obtained to pay Mikayla her half of BCM's value, he has not established a need for attorney fees. Nor has Paul shown that Mikayla has an ability to pay his attorney fees. Although Mikayla likewise has significant assets following the dissolution, her monthly expenses exceed her monthly income. Therefore, Mikayla's ability to pay attorney fees is not greater than Paul's. In addition, Mikayla has raised issues of merit on appeal. *See id*. We therefore decline Paul's request for fees under RCW 26.09.140.

Paul is also not entitled to fees under RAP 18.9(a) because Mikayla's appeal was not frivolous. An appeal is frivolous if there are no debatable issues on which reasonable minds could

differ and is so totally devoid of merit that there was no reasonable possibility of reversal. *In re Recall of Feetham*, 149 Wn.2d 860, 872, 72 P.3d 741 (2003). Mikayla prevails with respect to several issues on appeal and raised debatable issues on others. Accordingly, we deny Paul's request for fees under RAP 18.9(a).

CONCLUSION

We hold that the trial court abused its discretion in allocating the parties' property when it awarded Paul a second $80,000 payment from the Ally Bank account and when it distributed a $12,000 tax refund that never existed. We further hold that the trial court properly characterized the real property on which Paul's business was located as his separate property. In addition, we hold that the trial court abused its discretion when it awarded Mikayla only two years of decreasing spousal maintenance after a 16-year marriage. Finally, we hold that the trial court abused its discretion when it did not consider or enter findings addressing Mikayla's need or Paul's ability to pay when it denied Mikayla's request for attorney fees.

Accordingly, we reverse in part and affirm in part and remand for further consideration.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

No. 54382-6-II

CRUSER, J.

We concur:

WORSWICK, J.

, C.J.
LEE, C.J.

27